# EXHIBIT A

KEKER, VAN NEST & PETERS LLP
BROOK DOOLEY - # 230423
bdooley@keker.com
TRAVIS SILVA - # 295856
tsilva@keker.com
CHRISTOPHER S. SUN - # 308945
csun@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
BREE BERNWANGER - # 331731*
bbernwanger@lccrsf.org
HAYDEN RODARTE - # 329432
hrodarte@lccrsf.org
131 Steuart Street #400
San Francisco, CA 94105
Telephone:     415 814 7631
*N.D. Cal. admission pending*

Attorneys for Plaintiffs WILBUR P. G.;
WILFREDO BALTAZAR P. E., a minor child;
ERENDIRA C. M.; YASMIN ALICIA M. C., a
minor child; JOSHUA G. G.; and KARL LUIS
G. G., minor child

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WILBUR P. G.; WILFREDO BALTAZAR P. E. a minor child; ERENDIRA C. M.; YASMIN ALICIA M. C. a minor child; JOSHUA G. G.; and KARL LUIS G. G. minor child, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case No. 3:21-cv-4457 <br><br> **COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT** <br><br><br><br> **JURY TRIAL DEMANDED ON ANY CLAIM SO TRIABLE** |

## I.    INTRODUCTION

1.    Over the course of at least three months in 2018, the United States adopted a policy of intentionally separating immigrant families ("Family-Separation Policy" or "Policy") for the express purpose of causing those families emotional harm. The Policy was focused on our nation's southern border, where a substantial portion of arriving immigrants are citizens of Latin America coming to the United States to seek asylum. While the Policy was in effect, U.S. officials systematically separated parents from their children using methods as diverse as they were appalling: ripping breastfeeding babies from the arms of their mothers,[1] spiriting away children in the middle of the night,[2] and luring them away under false pretenses.[3] It was a policy of unprecedented and unmatched barbarity—and it was intended to be so.

2.    The policymakers who created and directed the implementation of the Policy sought to "deter" immigrants, believing that if arriving asylum-seekers were subjected to inhumane treatment—including the severe emotional distress of having their children taken from them—they would "give up" on their asylum applications and agree to be deported from the United States. These policymakers articulated this vision for U.S. policy while they created the Family-Separation Policy, even though the right to apply for asylum is codified and protected by statute. The policymakers also sought to generate media coverage of the Policy and its effects, including the emotional pain caused by the Policy, believing that international media coverage of the United States' Family-Separation Policy would deter potential immigrants from coming to the United States to seek asylum.

3.    This case is about six specific individuals who suffered because of the Family-Separation Policy. The Plaintiffs are three pairs of parents and children. They share a horrifying

---

[1] *See* Ed Lavandera, *She says federal officials took her daughter while she breastfed the child in a detention center*, CNN (June 14, 2018), https://perma.cc/R9F5-B7YZ.

[2] *See Ms. L. v. U.S Immigr. & Customs Enf't*, Case No. 3:18-cv-00428-DMS-MDD, Dkt. 456 at 12 (S.D. Cal. Sept. 4, 2019) ("When B.L.S.P. and her son entered immigration detention on November 20, 2017, they were separated, and the following day B.L.S.P. awoke and found 'her son was gone.'").

[3] *See* Valerie Edwards, *Caged and separated: Photos show inside a Texas processing center where children are taken from their parents by border agents who "tell them they are just going for a bath"*, Daily Mail (June 17, 2018), https://perma.cc/22U2-U8G9.

common experience; all of the Plaintiffs were separated from the family member with whom they came to the United States, and this separation was carried out by government officials implementing the Policy.

4. When the government separated these families, the Plaintiff children were 6, 11, and 13 years old. The children did not know why they had been separated from their parents. The parents did not know why they had been separated from their children. None of the Plaintiffs knew whether they would ever be reunited with their families, and at various times, Plaintiffs believed that they might be deported from the United States alone, without their accompanying family member. All suffered from extreme emotional distress at the point in time when the government forcibly separated them, went on to endure additional weeks of sustained emotional distress during their forced separation, and then continued to experience lasting emotional distress even after they were reunified. This suffering was the intentional purpose of the Policy.

5. The government's conduct was, among other adjectives, tortious. Plaintiffs bring this action to seek redress for the harms they suffered as a consequence of the Policy.

## II.    JURISDICTION, VENUE, AND INTRA-DISTRICT ASSIGNMENT

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1346(b)(1).

7. Plaintiffs bring this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq*. The FTCA has an administrative exhaustion requirement under which a claimant, before filing suit, must tender an administrative claim to the federal government. If the relevant agency does not finally dispose of the administrative claim within six months, then the claimant is deemed to have exhausted administrative remedies. 28 U.S.C. § 2675(a). All Plaintiffs filed administrative claims with the relevant federal agencies more than six months ago, and the agencies did not finally dispose of the Plaintiffs' claims.

8. Because Plaintiffs reside in this District, venue is proper under 28 U.S.C. § 1402(b). Venue is proper in this District under 28 U.S.C. § 1391(e)(1) for the additional reason that a substantial part of the events giving rise to this claim occurred within this District.

9. This action is properly assigned to the San Francisco/Oakland Division pursuant to Civil Local Rule 3-2(c) and General Order 44(D)(1) because this action arises in Alameda and

San Francisco Counties and because FTCA cases are not exempt from intradistrict assignment.

**III.    PARTIES**

10.    Plaintiff Wilbur P. G. resides in San Francisco, California with his minor son, Plaintiff Wilfredo Baltazar P.E.[4] When federal officials separated him from his father, Wilfredo was 11 years old. Wilbur and Wilfredo have applied for asylum in the United States. Plaintiff Wilbur P. G. brings this action on his own behalf and, independently, on his son's behalf as his next friend.

11.    Plaintiff Erendira C. M. resides in Oakland, California with her minor daughter, Plaintiff Yasmin Alicia M. C. When federal officials separated her from her mother, Yasmin was 6 years old. Erendira and Yasmin have applied for asylum in the United States. Plaintiff Erendira C. M. brings this action on her own behalf and, independently, on her daughter's behalf as her next friend.

12.    Plaintiff Joshua G. G. resides in Oakland, California with his minor son, Plaintiff Karl Luis G. G. When federal officials separated him from his father, Karl was 13 years old. Joshua and Karl have applied for asylum in the United States. Plaintiff Joshua G. G. brings this action on his own behalf and, independently, on his son's behalf as his next friend.

13.    Defendant the United States of America is the appropriate defendant under the FTCA. 28 U.S.C. § 1346(b)(1). Defendant acted through the Department of Homeland Security ("DHS"), the Department of Health and Human Services ("HHS"), and the Department of Justice ("DOJ")—"federal agencies" of the United States under 28 U.S.C. § 2671—and their employees, officers, and agents, including but not limited to personnel of Custom and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE"), subcomponent agencies of DHS that are under the direction, authority, and control of the Secretary of Homeland Security; the Office of Refugee Resettlement ("ORR"), a subcomponent agency of HHS that is under the direction, authority, and control of the Secretary of Health and Human Services; and the Office of the Attorney General within the DOJ.

14.    The federal officers referenced in this Complaint were at all relevant times

---

[4] Plaintiffs are concurrently filing a motion to proceed under pseudonyms.

employees of the United States, working within the scope and course of their employment with the federal agencies listed above.

15.     DHS employees were responsible for separating Plaintiff parents from their children. DHS employees were also responsible for supervising and managing detained individuals at CBP and ICE facilities, including the facilities where the Plaintiff families were detained.

16.     HHS employees are responsible for supervising and managing the detention of children the government classifies as unaccompanied, including at facilities where Plaintiff children were detained while separated from their parents.

17.     High-ranking officials from DHS, HHS, and DOJ worked together to design and promulgate the unlawful and unconstitutional Family-Separation Policy, pursuant to which Plaintiffs were subject to significant harm.

## IV.     FACTUAL ALLEGATIONS

### A.     The United States institutes the Family-Separation Policy to forcibly separate families arriving at the southern border.

#### 1.     The government debates implementing a policy of intentionally separating migrant families.

18.     Federal law has long guaranteed noncitizens in the United States the right to seek protection from persecution and torture in their home countries.[5] The current asylum statute, codified in the Refugee Act of 1980, reflects "one of the oldest themes in America's history— welcoming homeless refugees to our shores," and "gives statutory meaning to our national commitment to human rights and humanitarian concerns."[6]

19.     In 2017, over 35 years after the Refugee Act became law, Donald Trump became the President. He swept into office on a wave of anti-immigration sentiment after promising to enact policies designed to prevent, deter, and discourage people from seeking asylum in the

---

[5] The right to apply for asylum, the best-known form of humanitarian relief from deportation, is codified at 8 U.S.C. § 1158(a)(1). Two other potential forms of protection are "withholding of removal," *see* 8 U.S.C. § 1231(b)(3), and a special type of relief from removal available under the Convention Against Torture, *see* 8 U.S.C. § 1231 note and 8 C.F.R. § 208.1(a).

[6] S. Rep. No. 96-256, 1st Sess. 1 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141, 141.

COMPLAINT
Case No. 3:21-cv-4457

United States. It was "his signature campaign issue."[7] Throughout his presidency, he continued his full-throated advocacy of sealing this nation's borders to immigrants seeking protection from persecution, declaring, "When people, with or without children, enter our Country, they must be told to leave without our Country being forced to endure a long and costly trial"—by which the President meant the statutorily-protected right to apply for asylum. The President continued, "Tell the people 'OUT,' and they must leave, just as they would if they were standing on your front lawn."[8] He also separately declared that, "We cannot allow all of these people to invade our country."[9]

20. Government policy toward asylum seekers adopted deterrence as its animating principle as a result. From 2016 to 2020, the U.S. government engaged in a concerted effort to curtail the number of individuals applying for asylum in the United States. One such government initiative became the Family-Separation Policy.

21. Within a few weeks of President Trump's inauguration, government officials from various agencies began considering a new, unprecedented initiative to separate children from their parents at the border as a means of deterring people from seeking asylum. Longstanding federal border policy that had spanned successive presidential administrations (and that was still in place at the time of President Trump's inauguration) had prioritized keeping families together. With the specific purpose of preserving family unity, DOJ had, for years, generally declined to refer

---

[7] Mimi Dwyer, *Factbox: How Trump followed through on his immigration campaign promises*, Reuters (Aug. 14, 2020), https://perma.cc/J88Z-G93Q; *see also* Erika Guevara Rosas, *Rebuilding from the ashes, Trump's heritage on immigration and asylum policy*, Amnesty International (Nov. 26, 2020), https://perma.cc/C3C4-K7AF ("One of the Trump administration's flagship issues, since his 2016 presidential campaign, has been migration and asylum."); Jeff Sessions, *Remarks to the Executive Office for Immigration Review* (Oct. 12, 2017), https://perma.cc/RR87-72JX.

[8] Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, Texas Tribune (July 10, 2018), https://perma.cc/G2HS-GAYJ.

[9] Brent D. Griffiths, *Trump: "We cannot allow all of these people to invade our country"*, Politico (June 24, 2018), https://perma.cc/G2TV-Q8H8.

parents migrating with children for prosecution of immigration-related offenses.[10] Similarly, DHS had a longstanding policy of keeping arriving immigrant families intact as their immigration cases were handled by immigration officials.[11]

22.     In a town hall meeting held on February 2, 2017—less than two weeks after President Trump's inauguration—John Lafferty, the head of the Asylum Office at U.S. Citizenship and Immigration Services, an agency within DHS, held an inter-governmental "town hall" meeting to describe policy proposals designed to lower the number of asylum applications in the United States by deterring asylum seekers from pursuing their claims. One such proposal that Lafferty described as under review was a new policy that would separate parents from their children.[12]

23.     In early March 2017, Secretary of Homeland Security John Kelly confirmed that the United States was evaluating whether to implement a policy of separating families, stating that he was "considering [doing so] in order to deter more movement along [the border]."[13] Other DHS officials provided similar confirmations. For example, an email sent by the Assistant DHS Secretary for International Affairs the next day revealed that "the 'separating families' issues" had been discussed at the Department's "morning huddle."[14] And, around the same time, DHS officials were reporting that the Department was considering a proposal to separate families entering the United States in order to deter parents from migrating with their children.[15]

---

[10] *See* U.S. Dep't of Justice, Office of the Inspector General, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* (Jan. 2021) at 2, https://perma.cc/2JBA-59Q8 [hereinafter "DOJ OIG Report"].

[11] *See id.*

[12] Julia Ainsley, *Trump admin discussed separating moms, kids to deter asylum seekers in Feb. 2017*, NBC News (June 18, 2018), https://perma.cc/ZHU4-JMA4.

[13] U.S. H. Comm. on the Judiciary, Majority Staff Report, *The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos* (Oct. 2020) at 6, https://perma.cc/4RY5-RN2B [hereinafter "House Report"].

[14] *Id.*

[15] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, Reuters (Mar. 3, 2017), https://perma.cc/P7DE-HX5A.

1666577

## 2. The government pilots a family-separation policy in El Paso.

24.     The United States piloted a formal family-separation policy in the U.S. Border Patrol's El Paso Sector from March through November 2017 (the "Pilot Program"). Through the Pilot Program, federal immigration officials began separating families arriving in that region in an effort to pressure migrant parents into foregoing their asylum claims and accepting deportation. The Pilot Program also sought to leverage the fear that immigrant parents might be separated from their children to deter migrants from trying to enter the United States in El Paso.

25.     The Pilot Program represented a deviation from the government's prior policy of not prosecuting adults traveling with minor children. As a Border Patrol official explained to Jim Tierney, the acting U.S. Attorney for the District of New Mexico, "it is the hope that this separation will act as a deterrent to parents bringing their children into the harsh circumstances that are present when trying to enter the United States illegally. . . . It is expected that once immigrants become aware that there is a higher probability of being prosecuted and separated if apprehended in Texas, the traffic will move to the areas surrounding the New Mexico Stations."[16] Put differently, the Pilot Program sought to assess whether family separation would deter migration.

26.     The Pilot Program required coordination between immigration officials and the U.S. Attorney's Office.

27.     Breaking from prior practice, U.S. Border Patrol officials who apprehended migrating families began referring parents for criminal prosecution. Parents with no prior criminal record were charged with illegally entering the United States, a misdemeanor.

28.     The immigration officials then exploited a provision of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), a statute meant to **protect** children from human trafficking, to pretextually justify seizing long-term custody of the child **from the child's parent**. The TVPRA defines an "unaccompanied alien child" (UAC) as a child who is under 18, lacks lawful immigration status, and for whom "there is no parent or legal guardian in the United States or no parent or legal guardian in the United States is available to provide care and physical

---

[16] DOJ OIG Report at 14 n.30, https://perma.cc/2JBA-59Q8.

custody."[17] Under the Pilot Program—and later, under the border-wide Family-Separation Policy—immigration officials separated children from the parents who accompanied them (and were available to provide physical care and custody) in order to classify the children as "UACs" and detain them separately from their parents. When immigration officials designate a child in their custody as a UAC, the TVPRA requires that the government transfer custody of the child to ORR. As part of the Pilot Program, after separating a child from their accompanying arriving parent, immigration officials classified the child as a UAC and whisked him or her off to ORR, which maintains child-welfare facilities throughout the country, even though the government knew the precise location of the child's parent.

29.     While the parents were being prosecuted for misdemeanor illegal entry, they were held in the custody of the U.S. Marshals Service. These proceedings are generally very short, with sentences usually being "time served," which may be as little as one day. Thereafter, the parent was transferred back to civil immigration custody. But by this point, immigration officials had moved the child to ORR custody, thus separating child and parent.[18] The Pilot Program did not contemplate or provide for the reunification of separated families at any point.

30.     Ultimately, the Pilot Program resulted in the separation of at least 280 different families, some of whom included breast-feeding mothers and their infants. The government did not implement any mechanisms to allow separated parents and children to locate one another or to track separations within government systems. Indeed, DHS and DOJ, which planned and implemented the Pilot Program, did not inform ORR of the policy or that the children being sent to their custody had been separated from arriving parents.[19] As a result, the government did not keep track of the families it had separated, and parents and children were detained incommunicado from one another and with no information about one another's location or well-

---

[17] 6 U.S.C. § 279(g)(2)(C).

[18] *See generally* DOJ OIG Report at 13-17, https://perma.cc/2JBA-59Q8.

[19] House Report at 7; *see also id.*, Appendix C (emails from HHS inquiring why children arriving in their custody were claiming to have been separated from parents), https://perma.cc/4RY5-RN2B.

being.[20]

### 3. The Pilot Program demonstrates that separating families at the border harms adults and children.

31.     Unsurprisingly, the Pilot Program prompted immediate backlash from prosecutors, judges, and other stakeholders in the area.[21] In response to the policy, John Bash, the Acting U.S. Attorney for the Western District of Texas, presciently remarked, "History would not judge [prosecuting family units] kindly."[22] Magistrate Judge Miguel Torres of the Western District of Texas presided over many of the resulting criminal prosecutions and documented that criminal defense attorneys and defendants had "repeatedly" voiced concerns "regarding their limited and often non-existent lack of information about the wellbeing and whereabouts of their minor children from whom they were separated at the time of their arrest."[23]

32.     High-ranking DOJ officials understood the severe emotional damage the Pilot Program inflicted on separated parents and children. As DOJ's Inspector General would later document in a report, U.S. Attorney Bash briefed high-ranking policymakers within DOJ, including Gene Hamilton, Counselor to the Attorney General, about the Pilot Program. On information and belief, at this meeting, government officials discussed the severe emotional effects that the Pilot Program had on separated migrants, as well as local government and judicial criticism of the Pilot Program. Indeed, the Inspector General documented that Bash's meeting notes contained specific references to Judge Torres's concerns that the government had implemented the program in a way that made it impossible for families to reunify.[24]

33.     The DOJ and DHS policymakers responsible for the Pilot Program knew or should have known that family separation would harm families. The government was aware of the acute harm that results from family separations long before it instituted the Pilot Program.

34.     A September 30, 2016 DHS Advisory Committee report noted that "[s]eparation

---

[20] DOJ OIG Report at 15, https://perma.cc/2JBA-59Q8.

[21] *Id.* at ii, 15.

[22] *Id.* at 13.

[23] *Id*. at 16.

[24] *Id*. at 17.

1666577

can be acutely frightening for children, and can leave children in ad hoc care situations that compromise their safety and well-being. It can also be traumatizing and extremely stressful for the parent who is dealing with the underlying situation but also possible feelings of guilt and worry for their child."[25]

35.     Leon Fresco, a DOJ official in the Obama Administration, has stated that the government had previously considered, but ultimately rejected, family-separation policies because "the idea was that it was too detrimental to the safety of the children to separate them from their parents."[26]

36.     Predictably, as the effects of the Pilot Program became increasingly apparent over the course of the program's existence from 2017 to 2018, DHS began receiving scores of complaints through its Office of Civil Rights and Civil Liberties ("CRCL"), many of which described the extreme trauma that separation caused adults and children, and which highlighted the "needless cruelty" of the separations.[27]

37.     Officials inside and outside of the government continued to voice concerns about the harmful effects of the Pilot Program even after it was terminated in 2018. In fact, following the Pilot Program's termination, some government officials publicly disavowed it because of the chaos and suffering it caused. For example, following the briefing that he provided to DOJ policymakers about the Pilot Program, Acting U.S. Attorney Bash thought "the idea [had been] abandoned" and would not be implemented nationwide.[28]

38.     In March 2018, United States Public Health Service Commissioned Corps Commander Jonathan White, who was then detailed to HHS as the Coordinating Official and Incident Commander for the Unaccompanied Alien Children Program, expressed to senior ORR

---

[25] Report of the DHS Advisory Committee on Family Residential Centers (Sept. 30, 2016) at 29, https://perma.cc/CZE7-WWZR.

[26] Daniella Diaz, *Kelly: DHS is considering separating undocumented children from their parents at the border*, CNN (Mar. 7, 2017), https://perma.cc/L4Q9-KVAW.

[27] House Report at 10; *see also id.*, Appendix A (chart of 850 CRCL complaints, including over 200 that preceded the May 2018 implementation of the Family-Separation Policy border-wide), https://perma.cc/4RY5-RN2B.

[28] DOJ OIG Report at 19, https://perma.cc/2JBA-59Q8.

leadership that a family-separation policy was "inconsistent with our legal requirement to act in the best interest of the child."[29]

39.     Also in March 2018, the American Academy of Pediatrics (AAP), upon learning that the administration was considering a border-wide Family-Separation Policy, wrote to DHS six times and issued about as many public statements noting that "family separation devastates the most basic human relationship we know, that of parent and child."[30]

40.     As a result, high-level policymakers knew from experts and from the experience of the Pilot Program that separating migrant children from their parents would cause extreme emotional pain and suffering. But rather than steer government policy away from such harmful outcomes, the emotional pain and suffering that migrants experienced during the Pilot Program was what motivated high-level policymakers to expand the Pilot Program border-wide in 2018.

### 4.     The United States formally implements the Policy border-wide.

41.     With full knowledge of the grievous harm the Pilot Program inflicted on migrant families, the U.S. government continued weighing policy proposals that would purposefully separate migrant families along the border. These proposals would ultimately culminate in the Family-Separation Policy.

42.     In August 2017, a group of DHS officials drafted memos outlining a further range of policies designed to reduce the number of people entering the United States to apply for asylum. One of the proposals involved separating parents from their children at the border.[31]

43.     Similarly, in an email dated December 11, 2017, Thomas Blank, the Chief of Staff of ICE, described how the agency had been asked to take the lead on drafting a decision memo

---

[29] Commander White provided this as sworn testimony. *See Examining the Failures of the Trump Administration's Inhumane Family Separation Policy*, Hr'g Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce, 116th Cong. (February 7, 2019) at 1114-138, 1514-519, 2363-367 [hereinafter "House Hearing"] (testimony of Commander Jonathan White, United States Public Health Service Commissioned Corps), https://perma.cc/E7TD-PMCP.

[30] *Id*. at 3220-235 (testimony of Dr. Julie Linton, Co-Chair of the American Academy of Pediatrics Immigrant Health Special Interest Group), https://perma.cc/E7TD-PMCP.

[31] Jonathan Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from Their Parents*, The New Yorker (May 30, 2018), https://perma.cc/7CBV-QRFM.

regarding "separating Family Units."[32]

44. An intra-agency memo dated December 16, 2017, and entitled "Policy Options to Respond to Border Surge of Illegal Immigration," was circulated between high-level officials at DHS and DOJ.[33] Among other things, the memo recommended that the government adopt many of the same processes that had defined the Pilot Program, including "separating family units, placing . . . adults in adult detention, and placing . . . minors . . . in the custody of HHS as unaccompanied alien children." The memo further recommended that "[Border Patrol] and ICE . . . work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the border." As a result, "parents would be prosecuted for illegal entry . . . or illegal reentry . . . and the minors present with them would be placed in HHS custody." The memo specifically contemplated that "the increase in prosecutions would be reported by the media and it would have a substantial deterrent effect."[34]

45. Notwithstanding the well-documented harm the Pilot Program had caused and the knowledge that additional separations would cause separated children and their parents severe emotional harm, the United States formally unveiled the Family-Separation Policy on April 6, 2018, in a memo from Attorney General Jeff Sessions titled "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)."[35] Effectively adopting the Pilot Program border-wide,[36] the Family-Separation Policy targeted parents crossing the border for prosecution and used that prosecution as a pretext for designating their children as UACs so that the children could be sent to, and detained in, HHS facilities far away from where their parents were being held.

46. Government officials repeatedly acknowledged that the actual goal of the so-called "Zero Tolerance" policy was separating families.

---

[32] American Oversight, *A Timeline of the Trump Administration's Family Separation Policy*, https://perma.cc/D8JS-K8FM.

[33] *Id.*

[34] *See* Policy Options to Respond to Border Surge of Illegal Immigration, at 1, https://perma.cc/7KRZ-PXW7.

[35] Press Release, Attorney General, MEMORANDUM FOR FEDERAL PROSECUTORS ALONG THE SOUTHWEST BORDER (Apr. 6, 2018), https://perma.cc/L845-BF3X.

[36] DOJ OIG Report at 19, 30, https://perma.cc/2JBA-59Q8.

1666577

47.     Shortly after implementing the policy, Attorney General Sessions stated: "If you smuggle illegal aliens across our border, then we will prosecute you. If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law."[37] The Attorney General's statement ignored both that most adults who arrive at the border with children are arriving with their own children and also that, as explained in further detail below, what is "required by law" is that the government keep arriving families unified and that where, for whatever reason, children are separated from their parents, the government work quickly to reunify children with their parents.

48.     On May 11, 2018, Sessions stated his goal even more clearly. During a conference call with the five U.S. Attorneys responsible for the jurisdictions at the southwest border, he declared, "***we need to take away children***."[38]

49.     When subsequently asked during an interview on Fox News whether family separations were being used as a deterrent, Sessions responded, "yes, hopefully people will get the message."[39]

50.     Around that same time, John Kelly, by then the White House Chief of Staff, was asked why the United States was separating families from their children. He responded that "a big name of the game is deterrence" and that family separation "could be a tough deterrent—would be a tough deterrent."[40]

51.     The acting Assistant Secretary for HHS also explained that he expected the fear of separation would discourage families from migrating: "We expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[41]

52.     Policymakers also intentionally refused to take steps that would facilitate

---

[37] *Id*. at 1.

[38] *Id.* at 39 (emphasis added).

[39] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, Washington Post (June 19, 2018), https://perma.cc/LTB8-878Y.

[40] Transcript: *White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018), https://perma.cc/ZN5N-VN5R.

[41] Bump, *supra* note 39, https://perma.cc/LTB8-878Y.

COMPLAINT
Case No. 3:21-cv-4457

1666577

reunification after separation. From the Pilot Program, policymakers knew that the relevant government agencies' failure to record and track separations and family relationships made it impossible to identify parent-child relationships and reunify families.[42] Officials had been directly notified of these deficiencies before implementing the Family-Separation Policy.[43] Some agency officials warned that there would be no system to track and identify separated families even within the Border Patrol's agency-wide system—let alone between agencies. However, other "key stakeholders" urged the government to roll out the Family-Separation Policy before these identified deficiencies had been resolved.[44] Thus, the United States chose not to wait and implemented the Family-Separation Policy, knowing full well it had no system in place to track and reunify separated families.

53.     In implementing the Family-Separation Policy, the government targeted families for prosecution so that it could generate a pretext for separating them.[45] Among other things, Attorney General Sessions specifically directed U.S. Attorneys in jurisdictions along the southwest border to focus prosecution efforts on families that had been apprehended after crossing the border.[46]

54.     In practice, the cruelty and chaos of the Family-Separation Policy, and the prolonged duration of the separations it caused, far exceeded the bounds of the government's pretextual explanation that the Policy was intended to increase prosecution rates for illegal entry violations. Federal agents did not limit application of the Policy to parents being prosecuted for illegal entry; they also forcibly separated children (such as Plaintiff children Wilfredo Baltazar P. E. and Karl Luis G. G.) from parents who were not referred for prosecution (such as Plaintiff parents Wilbur P. G. and Joshua G. G.) and kept them separated for months. In fact, more than 15

---

[42] U.S. Dep't of Homeland Security, Office of the Inspector General, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* (November 25, 2019) at 2, "Highlights", https://perma.cc/E7VW-ZH43 [hereinafter "DHS OIG Report"].

[43] *Id.* at 15.

[44] *Id.* at 18-19.

[45] Report of Syracuse University TRAC program, *"Zero Tolerance" at the Border: Rhetoric vs. Reality* (July 24, 2018), https://perma.cc/DB9Y-4NUC.

[46] DOJ OIG Report at 34-35, 24, https://perma.cc/2JBA-59Q8.

percent of all adults separated from children as part of the Family-Separation Policy were **not** referred for prosecution.[47]

55.     The United States even separated migrant parents from their children when the families followed the government's express instructions regarding how to enter the United States to apply for asylum. The government directed asylum applicants to enter the United States through official ports of entry to make their applications, and assured them that, by doing so, they could avoid any risk of family separation. For example, Secretary of Homeland Security Kirstjen Nielsen stated, "DHS is not separating families legitimately seeking asylum at ports of entry. If an adult enters at a port of entry and claims asylum, they will not face prosecution for illegal entry. They have not committed a crime by coming to the port of entry."[48] And Attorney General Sessions made similar statements, noting that asylum applicants should "come through the border at the port of entry."[49]

56.     Despite these promises and directions, however, the United States separated at least 60 asylum-seeking families at ports of entry between May and June of 2018.[50] The children separated were as young as 5 months old and were separated from their families for at least four weeks, and some for more than a year.[51]

57.      Even where parents were prosecuted, the cruelty and duration of the separation remained unexplained by any stated government justification. In many instances, for example, parents whose criminal proceedings lasted only a day would return to custody to find their children missing, and these separations would last for weeks or months, with parents receiving no

---

[47] DHS OIG Report at 33, https://perma.cc/E7VW-ZH43.

[48] Press Briefing by Press Secretary Sarah Sanders and DHS Secretary Kirstjen Nielsen (June 18, 2018), https://perma.cc/8JT9-P4B5.

[49] The Ingraham Angle (Fox News television broadcast June 18, 2018), https://perma.cc/LGA2-KYH4.

[50] U.S. Dep't of Homeland Security, Office of the Inspector General, *CBP Separated More Asylum-Seeking Families at Ports of Entry Than Reported and for Reasons Other Than Those Outlined in Public Statements* (May 29, 2020) at 2, https://perma.cc/38R4-ZL8T.

[51] *Id.* at 8.

information about their children's whereabouts or well-being.[52] In other instances, government officials purposefully arranged to have parents transferred to entirely different facilities after their prosecutions had ended so that they couldn't be reunited with their children.[53]

### 5. The United States terminates the Policy.

58. The cruelty of the Family-Separation Policy provoked a resonant public outcry immediately after it was implemented. This included litigation. The lead case, *Ms. L. v. U.S. Immigration and Customs Enforcement*, was expedited and key judicial orders were issued while the Policy was in effect. Judge Sabraw of the Southern District of California oversaw the case; he denied the government's motion to dismiss the plaintiff class's challenge to the Policy on June 6, 2018, holding that plaintiffs'

> allegations sufficiently describe government conduct that arbitrarily tears at the sacred bond between parent and child, and is emblematic of the exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective. Such conduct, if true, as it is assumed to be on the present motion, is brutal, offensive, and fails to comport with traditional notions of fair play and decency. At a minimum, the facts alleged are sufficient to show the government conduct at issue "shocks the conscience" and violates Plaintiffs' constitutional right to family integrity.[54]

59. Under public and judicial pressure, President Trump revoked the government's Family-Separation Policy by Executive Order. His June 20, 2018 order directed that DHS "shall, to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members."[55] In doing so, however, he confirmed that the Family-Separation Policy's goal had been to separate parents from their children. After terminating the Policy,

---

[52] *The Trump Administration's Child Separation Policy: Substantiated Allegations of Mistreatment*, Hr'g Before the H. Comm. on Oversight and Reform, 116th Cong. 32 (2019) (testimony of Jennifer Nagda, Policy Director at the Young Center for Immigrant Children's Rights), https://perma.cc/93ED-BSZF.

[53] U.S. Dep't of Homeland Security, Office of the Inspector General, *Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* (Sept. 27, 2018) at 15, https://perma.cc/9Z6P-6XD3.

[54] *Ms. L. v. U.S Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1167 (S.D. Cal. 2018) ("*Ms. L. I*") (internal quotation marks, citations, and alterations omitted).

[55] Affording Congress an Opportunity to Address Family Separation, Exec. Order No. 13,841, 83 Fed. Reg. 29,435 § 1 (June 20, 2018).

President Trump participated in an interview on Fox News, where he bemoaned: "Now you don't get separated, and while that sounds nice and all, what happens is you have literally you have ten times as many families coming up because they're not going to be separated from their children . . . . It's a disaster."[56] During the interview, he affirmed that the practice of separating families was intended as a "disincentive" for entering the country,[57] and reiterated the point during a later press conference, stating, "If [asylum applicants] feel there will be separation, they don't come."[58]

60.     Six days after the Family-Separation Policy was officially terminated, Judge Sabraw preliminarily enjoined the Family-Separation Policy.[59] Holding that "the record in this case reflects that the separations at issue have been agonizing for the parents who have endured them," Judge Sabraw held that the Plaintiffs were likely to succeed on the merits that the Policy violated their longstanding constitutional right to family integrity and ordered the government to reunify the families who had been separated as a result of government conduct.[60]

61.     But the damage had already been done. During the three months when the Family-Separation Policy was in effect border-wide, the United States forcibly separated more than 3,000 children—including Plaintiffs Yasmin Alicia M. C., Wilfredo Baltazar P. E., and Karl Luis G. G.—from their parents.[61] Moreover, it quickly became clear that the government could not readily comply with the injunction requiring reunification. Because the goal of the Family-Separation Policy had been to separate—and not reunify—families, the government had taken no steps to ensure there were systems in place to track separated family members so as to reunite

---

[56] Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, Washington Post (Apr. 28, 2019), https://perma.cc/SQW9-MGD2.

[57] *Id.*

[58] David Shepardson, *Trump says family separations deter illegal immigrations*, Reuters (Oct. 13, 2018), https://perma.cc/DM9H-F993.

[59] *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018) ("*Ms. L. I*") (preliminary injunction), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019); *Ms. L. v. U.S. Immigr. & Customs Enf't*, 331 F.R.D. 529 (S.D. Cal. 2018) (class certified).

[60] *Ms. L. II*, 310 F. Supp. 3d at 1146, 1149.

[61] DOJ OIG Report at 43, https://perma.cc/2JBA-59Q8.

them, even after the Pilot Program revealed that the consequences of failing to maintain such systems included prolonged and potentially permanent separation, such as through the deportation of a parent without their children.[62]

62. Because the government adopted the Family-Separation Policy without any plan regarding how to successfully reunify separated family members—not even a check-box in the information technology systems for relevant government agencies indicating a family had been separated, or a link between the parent and child's records—officials had adopted various ad hoc methods to record and track family separations while the Policy had been in effect.[63] Predictably, these ad hoc methods led to widespread errors, for which government officials subsequently expressed "embarrassment."[64] Judge Sabraw was more pointed in his criticism of the government's lack of planning, finding in the *Ms. L.* preliminary injunction that the "unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*."[65] Indeed, the government did not implement any formal systems to track separated families until months *after* President Trump issued the Executive Order terminating the Policy.[66]

### 6. As experts and government officials had predicted, the Family-Separation Policy caused severe and long-lasting harm.

63. The Family-Separation Policy caused extreme and lasting harm to both parents and children. A Physicians for Human Rights investigation based on psychological evaluations of asylum-seeking parents and children who were separated by the government under the Policy "found pervasive symptoms and behaviors consistent with trauma; most met diagnostic criteria for at least one mental health condition, such as post-traumatic stress disorder, major depressive disorder, or generalized anxiety disorder consistent with, and likely linked to, the trauma of

---

[62] *Id.* at ii.

[63] DHS OIG Report at "Highlights," https://perma.cc/E7VW-ZH43.

[64] *Id.* at 12.

[65] *Ms. L. II*, 310 F. Supp. 3d at 1144.

[66] DHS OIG Report at 19, https://perma.cc/E7VW-ZH43.

family separation."[67] That trauma would likely result in "higher rates of chronic medical conditions, such as cardiovascular disease, cancer, and premature death."[68] It would also cause "an increased risk of psychiatric disorders such as anxiety, depression, and psychosis, and of detrimental coping behaviors such as smoking and the use of alcohol or drugs."[69] Notably, the investigation concluded that the Family-Separation Policy "constitute[d] cruel, inhuman, and degrading treatment" and rose "to the level of torture."[70]

64.     Both parents and children suffered this harm. Doctors have testified that, for parents, "[f]orcible family separation can . . . have devastating psychological and neurobiological consequences."[71] In adults, psychological trauma causes an elevated risk for psychiatric disorders including post-traumatic stress disorder. It can also induce physiological changes, including, but not limited to, dysregulated stress responding, amygdala hyperactivity, and deficits in prefrontal cortex control of the amygdala, which are associated with difficulty regulating fear.[72]

65.     Doctors have cautioned that "[s]eparated children can face immediate health problems, including physical symptoms like headaches and abdominal pain; changes in bodily functions such as eating, sleeping, and toileting; behavioral problems like anger, irritability, and aggression, and difficulty with learning and memory."[73] Children who have been separated may also experience feelings of mistrust and bereavement, guilt, or shame. And in the long term, they may be susceptible to chronic conditions such as depression, post-traumatic stress disorder, diabetes, or heart disease.[74]

---

[67] Physicians for Human Rights, *"You Will Never See Your Child Again," The Persistent Psychological Effects of Family Separation* (Feb. 2020) at 3, https://perma.cc/X6YQ-7J73.

[68] *Id.* at 24.

[69] *Id*.

[70] *Id.* at 5.

[71] *J.P. v. Sessions*, No. LA-CV-1806081-JAK(SKx), 2019 WL 6723686, at *10 (C.D. Cal. Nov. 5, 2019) (citing declaration of Dylan Gee, Assistant Professor of Psychology at Yale University).

[72] *Id.*

[73] House Hearing at 3243-252 (testimony of Dr. Julie Linton, Co-Chair of the American Academy of Pediatricians Immigrant Health Special Interest Group), https://perma.cc/E7TD-PMCP.

[74] *Id.*

66.     In a statement to Congress opposing family separation, the American Academy of Pediatrics warned: "We know that family separation causes irreparable harm to children. This type of highly stressful experience can disrupt the building of children's brain architecture. Prolonged exposure to serious stress—known as toxic stress—can lead to lifelong health consequences."[75] Government officials in the agencies responsible for implementing the Family-Separation Policy have themselves testified that "separating children from their parents poses significant risk of traumatic psychological injury to the child."[76] Notably, these harms can persist even after the eventual reunification with a parent or other family.[77] Doctors have concluded that many of the children that the United States separated from their parents will be seriously impaired for the rest of their lives.[78]

**B.      Guided by the Policy, the government separates and harms Plaintiffs.**

67.     This case isn't about the Family-Separation Policy in the abstract; it is about three families who suffered cruel harm as a result of that policy. As explained below, all three families that are Plaintiffs in this action entered the United States by crossing from Mexico into Arizona in or around May 2018. The government forcibly separated these parents and children in CBP's Arizona facilities without notice or explanation. Plaintiffs then spent weeks detained in different facilities with the government facilitating little to no communication between parents and children.

---

[75] Amnesty International, *"You Don't Have Any Rights Here": Illegal Pushbacks, Arbitration Detention & Ill-Treatment of Asylum-Seekers in the United States"* (2018) at 34, https://perma.cc/26CM-UC6C.

[76] House Hearing at 1084-091 (testimony of Commander Jonathan White, United States Public Health Service Commissioned Corps), https://perma.cc/E7TD-PMCP.

[77] *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) (citing Julie M. Linton, Marsha Griffin, Alan J. Shapiro, American Academy of Pediatrics Policy Statement, *Detention of Immigrant Children*, Pediatrics, Vol. 139, Num. 4, April 2017).

[78] House Hearing at 3558-562 (testimony of Dr. Jack Shonkoff, Professor of Child Health and Development at the Harvard Chan School of Public Health and the Graduate School of Education and Professor of Pediatrics at Harvard Medical School), https://perma.cc/E7TD-PMCP.

1. **Wilbur P. G. and Wilfredo Baltazar P. E.**

   a. **The government forcibly separates Wilbur and Wilfredo.**

68.    In 2018, Wilbur and his son Wilfredo fled El Salvador to seek asylum in the United States. Wilbur and Wilfredo entered the United States in or around San Luis, Arizona, on or about May 27, 2018. At the time, Wilfredo was eleven years old.

69.    Wilbur and Wilfredo had a harrowing journey. After spending days in the desert trying to reach safety in the United States, a group of men mugged Wilbur and Wilfredo and threatened to kill them. The muggers took the last of their food, water, and clothes. They also took the few belongings Wilbur and Wilfredo had carried in a backpack. Wilbur and Wilfredo continued to wander, lost in the desert, until they came upon an area surrounded by a tall fence. Distressed and needing assistance, they surrendered to the CBP officers inside of the fence. The CBP officers yelled at them, telling them not to move closer. The CBP officers searched Wilbur and Wilfredo, took their shoelaces, belts, and everything in their pockets, and arrested them. Wilbur and Wilfredo were hungry and thirsty and had little more than the clothes on their back, but the CBP officers who arrested them did not provide them food or water. Wilbur was experiencing serious physical pain—his feet had blistered badly after days of walking in the desert—but the CBP officers provided no first aid, nor did they conduct a medical screening. Instead, CBP officers forced Wilbur and Wilfredo to remain in a frigid CBP vehicle for several hours while the officers drove through the desert, apprehending more people. When Wilbur asked the officer driving the vehicle to increase the temperature, the driver refused.

70.    CBP officials took Wilbur and Wilfredo to a *hielera*. Migrants call CBP's detention facilities "*hieleras*" (or "iceboxes" in Spanish) because of their extremely cold temperatures, all-cement or -concrete surfaces, and lack of natural light.

71.    While CBP officials booked Wilbur and Wilfredo into the *hielera*, Wilfredo hung onto Wilbur tightly, not wanting to leave his side even while officers interviewed Wilbur. No one asked Wilbur or Wilfredo about their health or whether they were suffering from any medical conditions. Instead, officers told them that if they asked for medical care, they would have to stay in detention longer, which scared and discouraged Wilbur from seeking attention for his injured

feet.

72.    CBP officers locked Wilbur and Wilfredo in a filthy cell that was full of other fathers and their children. It was packed so tightly that it was difficult to find space to sit down and it was impossible to lie down to sleep. Some of the men and boys were able to sit on floor mats strewn around the cell, but there was not enough space to lie down. The cell had no windows to the outside and no clock. It was constantly lit by bright overhead lights.

73.    Wilbur and Wilfredo had little, if any, access to toilets because the cell was so crowded, with people trying to sleep around the toilet area. CBP officers did not offer Wilbur or Wilfredo the opportunity to shower or any fresh clothes. Wilbur tried to help Wilfredo get comfortable enough to sleep. He tried standing to give Wilfredo more space to lie down on the floor, even though the blisters on his feet caused him incredible pain. At other times, Wilbur sat down and held Wilfredo in his arms. The cell was cold, and Wilbur also tried unsuccessfully to help Wilfredo get warm. CBP officers had left a pile of mylar sheets at the door of the cell, although there were not enough for the children in the cell and their parents. Wilbur gave a mylar sheet to Wilfredo and did not take one for himself, but Wilfredo was still cold and shivering. Wilbur watched as Wilfredo, visibly exhausted, would fall asleep only to awake abruptly, terrified. Wilbur would speak to Wilfredo and try to soothe him. Wilfredo would eventually relax again at the sound of his father's voice. For his part, Wilbur felt overwhelming fatigue but could not sleep. The cell was noisy; CBP officers would open the door from the processing area and call names. At one point, Wilbur heard a young child crying uncontrollably for his mother in the processing area that Wilbur and Wilfredo had just been through. He also heard the officers' mounting irritation as the child did not stop crying.

74.    CBP officers provided little food and water to Wilbur and Wilfredo. At intervals that seemed to line up with breakfast, lunch, and dinner, officers gave Wilfredo and other children a cookie and a bottle of juice. The officers gave Wilbur and the adults instant noodles, but prepared them with cold water instead of hot water, rendering them inedible. The officers did not give Wilbur or Wilfredo fresh water. The only water in the cell came from a sink attached to a filthy metal toilet, which Wilbur or Wilfredo had to try to drink with their hands or fill into one of

Wilfredo's used juice bottles. The water had a terrible, chemical taste, and Wilbur and Wilfredo had trouble drinking it. Meanwhile, Wilbur's feet deteriorated. The blistered skin leaked blood and pus, but Wilbur had no way to clean or treat it.

75.     Wilbur and Wilfredo both felt disoriented in the cell, which was brightly lit at all hours and had no windows to the outdoors. After what felt like two nights together in the bright, crowded cell, CBP officers entered the cell and said that they were moving all of the children to a separate cell and that the children could not stay with the adults. The officers did not explain why the children were being moved, disclose how long the separation would last, or provide any other information.

76.     As the officer spoke, Wilfredo held tightly to Wilbur. Wilfredo's breath became heavy and his heart raced. Wilbur could feel these physical changes as Wilfredo clung to him. Wilfredo was nervous and terrified of leaving his father's side. Wilbur did not want Wilfredo to be separated from him, even temporarily, but did not know how to stop it. When another man told the officers he did not want to be separated from his children, the officers refused to respond directly. Instead, officers repeated that the children could not remain in the cell and refused to provide any additional information. Wilfredo began to cry and told Wilbur that he did not want to leave. Wilbur tried to comfort Wilfredo, telling him that they would be apart for a short time. Wilbur did not imagine at the time that the officials intended to detain them separately for nearly two months. Looking back today, Wilbur feels guilt for the false hope he gave Wilfredo in the moment Wilfredo was taken from him.

### b.     Wilbur's continued immigration detention.

77.     In the hours that passed after CBP officers took Wilfredo from him, Wilbur's mental state began to spiral out of desperation and fear. Wilbur and the other fathers asked the CBP officers who came in and out of their cell when they could see their children again. The officers did not respond; they acted as if no one had said anything to them.

78.     Eventually, a CBP officer called Wilbur out of the cell. The officer spoke Spanish poorly, but communicated to Wilbur that CBP had sent Wilfredo away to a shelter and that Wilbur had to sign some paperwork about it. Wilbur felt like Wilfredo had been robbed from him.

He asked the officer what had happened, why they had been separated, and why Wilbur had not even been allowed to say goodbye. The officer did not answer Wilbur's questions or find someone else who could answer them in Spanish. His only response was to insist that Wilbur sign the paperwork. All of the paperwork was in English, which Wilbur could not read or speak.

79.     When Wilbur returned to his cell, he told the other detained fathers that Wilfredo had been sent away. The other fathers tried repeatedly to get the CBP officers' attention to ask them what had happened to their children and why. The officers refused to come to the door. A window in the cell opened onto the officers' workstations, so the fathers in the cell looked out through the window, gesturing, tapping, and trying desperately to get the officers' attention so that they could ask the officers their questions. An officer eventually opened the door and came in only long enough to tell the fathers to get away from the window. The fathers in the cell tried to ask the officer what had happened to their children and why. The officer refused to answer, ignoring their questions and shutting the door on them again.

80.     After taking their children, CBP officers moved Wilbur and the other detained fathers from their prior cell into an even more crowded, filthier cell that was so full of men that even the bathroom area was packed with men searching for enough space to sit down. Wilbur no longer had access to even the few mats and mylar blankets that were available in his previous cell. The cell was so crowded that he did not have room to sit down—let alone lie down to rest. The odor was overwhelming.

81.     CBP detained Wilbur in this same filthy, crowded *hielera* cell for, he estimates, about another week. During this time, Wilbur had no information about his son's location or well-being, leading him to grow frustrated and distressed. He was consumed with thoughts and questions about where his son might be.

82.     Wilbur and the men detained with him repeatedly asked for information about their children. Instead of answering their questions, CBP officers insulted them and threatened to punish them for making eye contact. When officers entered the cell, they often asked Wilbur and the men detained with him why they were trying to invade the United States. CBP officers told Wilbur and the men detained with him that they were not permitted to look the officers in the

face.

83.     CBP officers provided Wilbur and the men detained with him little food. Often, the instant noodles the CBP officers distributed were prepared with cold water and inedible. The officers withheld food as punishment if any of the detained men noted problems with the food or failed to follow the officers' orders. For example, if someone notified the officers that the noodles were not properly cooked, the officers closed the door and stopped distributing food. As another example, if Wilbur or the other men detained with him did not line up as quickly or in as orderly a fashion as the officers demanded in English—which was difficult given how crowded the cell was and that most of the detained men did not speak English—the CBP officers would yell at the detained men and refuse to distribute food. If a detained man requested an extra serving of food on behalf of someone too ill to stand in line, the CBP officers would yell and refuse.

84.     During the days he spent detained in the *hielera*, the infection in Wilbur's feet advanced and spread. The infection had started at the bottom of his feet, but spread upwards. Wilbur's socks were soaked with the blood and pus leaking from his feet, but he had no way to clean or change them. His feet emitted a terrible smell. CBP officers did not provide him any opportunity to shower, and he had no way to clean his feet. When Wilbur again tried to tell a CBP officer about the infection, the officer responded by saying that Wilbur was not allowed to look him in the face. The officer then told Wilbur that if he had a medical problem, he would have to stay in custody longer. Wilbur felt afraid and like he was being punished for seeking medical attention. At no point while he was in CBP custody did Wilbur receive any medical attention. On information and belief, CBP officials also did not make any record of his injuries and infection or the fact that he had reported them to officials.

85.     Wilbur entered a period of serious mental desperation and fear. He felt intimidated by the officers, afraid to lift his head up for fear that he would violate their rules by looking them in the face. He lost his appetite. He implored the CBP officers for information about his son, but the officers told Wilbur he could only get that information if he signed his own voluntary deportation papers. For days, Wilbur asked about his son, and CBP officers responded only by telling him that he should accept deportation. He felt like it was a trap, and that the CBP officers

were exploiting the separation to coerce him into accepting deportation. Although he was afraid to return to El Salvador and had fled to the United States to escape persecution there, in a desperate attempt to learn more about the location of his son, Wilbur filled out documents that he did not understand. CBP officers proceeded to photograph and fingerprint him, leading Wilbur to believe and fear that he might be deported without his son.

86.     CBP officials did not, however, deport Wilbur. After about a week in the *hielera*, immigration officials transferred Wilbur to another immigration detention site in or near Florence, Arizona. Up until the transfer, officials had not told Wilbur anything about what would happen to him, which left him gripped with fear and anxiety about being deported. Once he arrived in Florence, Wilbur inquired about the whereabouts of his son, but the officials there refused to provide any information.

87.     When Wilbur arrived in Florence, officials allowed him to shower and change clothes for the first time since he and his son had turned themselves in to CBP officers over a week prior. The infections in his feet had continued to advance. When he removed his filthy shoes and socks to shower, his wounds were visible and emitted a horrible odor. Other men in the showers expressed disgust at the smell. Along with the physical pain of his injuries, Wilbur felt tremendous embarrassment and shame. No one offered Wilbur any medical assistance.

88.     Several days after Wilbur arrived in Florence, detention center personnel finally performed a cursory medical check. They checked his lungs, eyes, and blood pressure, and asked him a series of questions. Wilbur told them about the infections in his feet and that he could not walk without excruciating pain. By this point, the pain of the infection extended through the entire lower half of Wilbur's body and he felt a strong, constant, pulsing pain throughout his legs and up to his waist. The person performing the medical examination did not respond when Wilbur spoke about his injuries and did not ever look at Wilbur's feet; it was as if Wilbur had said nothing at all. The person performing the medical examination also did not take Wilbur's temperature.

89.     While he was in detention, Wilbur asked about his son every opportunity he got. He learned how to use "request" forms and repeatedly filled them out, asking where his son was,

how he could contact him, and if he could at least receive an update on his son's health and emotional state. Wilbur filled out multiple requests but never received a response.

90.     Wilbur felt desperate and deeply depressed by his separation from, and lack of information about, his son. He could not sleep. At night, his mind raced with fears and concerns for Wilfredo. Wilbur would become so anxious he would begin to dry-heave, feeling like he needed to vomit, but unable to expel anything. His mental state deteriorated so much that he began to feel detached from reality, experiencing a sensation that the world he was in was no longer real. Although Wilbur felt that federal officials had robbed him of his son, he also felt consumed with guilt and fear for Wilfredo's well-being.

91.     After spending about eight days in the Florence facility, Wilbur was transferred to a third immigration detention site, this one in or around Eloy, Arizona. He remained there for several weeks. This site felt like a prison. Wilbur was detained in a cell with one other detainee.

92.     When Wilbur arrived at the Eloy facility, the guards made him carry his mattress and other items up a staircase and into his cell. Though weeks had passed since he was detained, officials at every facility he had been through had refused to provide him any medical care or even acknowledge the painful, visible infections in his feet and legs. The infections had continued to intensify. Being forced to carry the furnishings for his cell up the stairs caused Wilbur searing pain. His socks and shoes were wet with pus and blood.

93.     When the infection became so advanced that Wilbur could barely remove his socks, bathe himself, or walk, he pleaded with guards for medical care, telling them he could no longer walk normally and without pain. Finally, guards took Wilbur to see someone he understood to be a nurse. By then, his feet and legs were discolored and yellow with infection. The nurse told Wilbur that his feet and legs had been infected for a long time and that his condition had deteriorated significantly from going so long without treatment. The nurse told him he needed antibiotics, but that detainees were not allowed to have antibiotics. Wilbur received a Vaseline-like cream instead. Wilbur also finally received a medication that he could take at breakfast and dinner.

94.     In Eloy, Wilbur continued to experience the physical manifestations of fear, stress,

1666577

and trauma over his son being taken from him. He could not sleep, continued to dry-heave, and continued to experience a terrifying sensation that the world was not real. He continued to seek information about Wilfredo at every opportunity but received no response.

95.     Forced to sleep directly under an air conditioning vent, Wilbur developed a throat infection. The guards yelled at the him in English and here also prohibited him and the men detained with him from making eye contact with them, telling the detainees to look at the floor instead. Guards also refused to intervene in instances of violence between detainees, leaving Wilbur in great fear for his safety.

96.     Eventually, a group of officers wearing different uniforms than the guards arrived at Eloy and identified themselves as ICE officers. The officers told Wilbur and the other men detained with him that they had information, and so Wilbur asked about his child, as did the other detained men. The ICE officers told Wilbur and the other men detained with him that, in order to see their children or leave detention, they would have to accept deportation. The ICE officers said that if the detainees agreed to be deported, they would be reunited with their children at the airport. Wilbur was terrified to return to El Salvador. He felt pressured by the ICE officers, but did not want to sign the paperwork until he was reunited with Wilfredo.

97.     Desperate to find his son, Wilbur began an investigation of his own. Using his extremely limited financial resources to pay for expensive phone calls from within the detention center, Wilbur called friends and asked them to search for Wilfredo. As a result of Wilbur and his friends' search—and with *no* assistance from the U.S. government—Wilbur eventually located his son at a detention center about a month later.

98.     Wilbur called the facility where his son was detained. He was told that Wilfredo had been processed as though he had entered the country alone, and that the detention center had no information indicating that Wilbur was his father or that they had entered together.[79] Wilbur felt shocked and horrified that the same government officials that had forcibly separated him from Wilfredo had also effectively erased their relationship.

_____

[79] After his release from detention, Wilbur, with the assistance of counsel, obtained CBP and ORR records dated May 27 and May 28 that clearly note that Wilbur and Wilfredo had been separated from each other.

99.     After Wilbur located Wilfredo through his own efforts, officials allowed them short phone calls, once a week, for a few weeks. During those calls, Wilbur immediately noticed a change in his son. Wilfredo's voice sounded hollow and empty, like he was sleepwalking. Wilbur could hear no happiness in his son. Wilfredo spoke little on the calls; he wept and said only that he wanted Wilbur to get him out of the detention center, that he felt bad there, and that he couldn't stand it. When Wilfredo wasn't crying, Wilbur could hear Wilfredo's voice trembling, like he was fighting back tears. Wilbur tried to offer strength to Wilfredo and make him feel strong, but Wilbur was also falling apart himself. Wilbur felt his stomach tighten and his breathing accelerate whenever he got off the phone with Wilfredo. Wilbur felt trapped—if he accepted deportation, he was afraid both he and Wilfredo would be killed in El Salvador—but if he didn't accept deportation, he couldn't be with his son. Wilbur says of this time: "I felt like I was locked in a room with no door."

### c.     Wilfredo suffers a sexual assault in ORR detention.

100.     After forcibly separating Wilfredo from Wilbur, CBP pretextually declared that Wilfredo was a UAC and turned him over to ORR. As soon as Wilfredo arrived in ORR custody, he told officials there that he had traveled to the United States with his father and that immigration agents had separated them. Although Wilfredo's records clearly indicated his father's identity, and that they had been separated, no one provided Wilfredo information about his father or the opportunity to speak with him for weeks. Wilfredo would remain detained by ORR for nearly two months before being reunified with his father.

101.     Wilfredo's experience in ORR custody includes a horrific instance of sexual abuse that continues to impact Wilfredo today. Obviously, ORR officials must supervise the children in their care.[80] ORR failed to provide that supervision to Wilfredo, and that failure led to him being sexually assaulted.

102.     A few days after entering ORR custody, Wilfredo asked to go to the bathroom and

---

[80] ORR provides child welfare care just as many public and private agencies do. These agencies must provide adequate supervision of the children in their care. For example, licensed California private childcare facilities have a responsibility to "provide care and supervision as necessary to meet the client's need," 22 C.C.R. § 80078(a), and the licensee is "accountable for the general supervision of the licensed facility," 22 C.C.R. § 80063(a).

was permitted to do so. When he was returning from the bathroom, another detained child—who was unsupervised—blocked Wilfredo's path and pulled Wilfredo to an adjoining area because, Wilfredo believes, the other child knew that the facility's cameras did not cover this area. Once out of the camera's view, the child took a piece of string and looped it around Wilfredo like a lasso. The child declared that Wilfredo "belonged to him" and was "his wife." Then, the child grabbed Wilfredo's genitals and proceeded to use his hands on Wilfredo in a sexual manner. After the assault ended, Wilfredo reported it to the facility's staff. But the staff did not inform Wilbur of the incident, and they also failed to provide appropriate follow-up support or counseling.

103.    This is not the only instance of ORR's failure to ensure adequate supervision in the facility where Wilfredo was placed. One day, while playing with other children, Wilfredo sustained a blunt trauma to the head. The children's play turned rough, and one of the other detained boys pushed Wilfredo to the ground. When Wilfredo protested being shoved, he was hit with blunt force to the head. The injury caused Wilfredo's head to swell and resulted in a bruise. On information and belief, the "game" that resulted in this injury was not supervised by an adult.

104.    Separated from his father, living in a detention facility in a foreign country, and suffering the after-effects of a sexual assault, Wilfredo struggled to cope. Wilfredo often became upset in detention and ran out of the classroom, at one point running to the gate and telling personnel that he needed to escape. But still, even knowing that Wilfredo was discussing "escape," had sustained a blunt-force trauma to the head, and had been sexually assaulted, ORR did not offer him counseling, therapy, or mental health-related services—services that any child-care provider should recognize as essential to aiding an eleven-year-old with processing the aftermath of a sexual assault.

105.    Even after Wilbur located Wilfredo, as described above, and the government allowed father and son brief phone calls, Wilfredo struggled to communicate his struggles to his father. Detention center personnel monitored Wilfredo's calls with his father. As a result, Wilfredo felt intimidated, and he was afraid to tell his father what had happened to him.

### d.    Wilbur and Wilfredo are eventually reunified after the government botches its first attempt to do so.

106.    After weeks of detention in Eloy, and almost two months following his separation from Wilfredo, an immigration judge found that Wilbur posed neither a flight risk nor a danger to the community and granted him a $16,000 bond. Through the contribution of a community organization, Wilbur was able to pay the bond and officials told him he would be released. The officials told him to sign papers, in English, that would secure his release. No one translated the paperwork into Spanish for Wilbur. Once again, Wilbur feared that he was being tricked into accepting his own deportation, but he signed the papers out of desperation.

107.    Officials loaded Wilbur into a bus late at night and left him at a bus station sometime in the early morning, though he had no way of knowing what time it was. The officials who left Wilbur at the bus station refused to tell Wilbur anything about his son. At this point, Wilbur believed that officials intended to keep Wilfredo in the detention center, but hoped that, after being released, he could get help and find him.

108.    The officials who left Wilbur at the bus station also did not tell him how to get from the bus station to California, where loved ones were ready to receive him. When Wilbur was released, officials returned to him the clothes he had been wearing when he was apprehended, and which he wore throughout the week he spent in the *hielera*, unable to shower or treat the weeping, bleeding, infected sores on his feet. No one had washed the clothes, which smelled foul.

109.    ICE officials knew that Wilbur had been bonded out of detention and had the contact information for the friends receiving him into their home upon his release, but ICE officials did not coordinate with them to arrange or secure funds for Wilbur's travel. Because most of Wilbur's money and his telephone had been stolen when he was assaulted on his journey to the United States, he had no way to purchase a bus ticket at the bus station. ICE officials had left him stranded and filthy, with no food or water. As other people began arriving at the bus station, Wilbur asked to borrow their phones. He was repeatedly rebuffed. He felt embarrassed by the disheveled state of his appearance and filth of the clothes that had been returned to him. Eventually, a kind stranger who spoke Spanish allowed Wilbur to borrow his phone to call

Wilbur's family and helped Wilbur buy a bus ticket from Arizona to California.

110.    While Wilbur was traveling from Arizona to California, federal agents brought Wilfredo to the bus station where Wilbur had earlier been stranded. ***No one had told Wilbur in advance that his son would be brought to meet him at the bus station.*** However, federal agents had told Wilfredo that his father would be at the bus station when Wilfredo arrived. When Wilbur was not there, Wilfredo was heartbroken. Officials returned him to the detention center, where he cried and refused food. He could not sleep. Officials called Wilbur and Wilfredo's family in California, who had been prepared to receive Wilfredo the entire time he was detained. The officials tried to pressure the family into buying a plane ticket for Wilfredo, but the family could not afford it. Eventually, officials agreed to purchase the ticket and to accompany Wilfredo to San Francisco. It was Wilfredo's first time on a plane.

###     e.    The forcible separation continues to harm Wilbur and Wilfredo today.

111.    When Wilbur met his eleven-year-old son at the San Francisco airport, he immediately noticed how profoundly his son had changed over the weeks they had been separated. Wilfredo no longer carried himself like a child at all. He was withdrawn; his expressions were sad and fearful. Wilbur also noticed that Wilfredo had a large, swollen bruise on his head that lasted long after his release. The official who accompanied Wilfredo on the flight handed Wilbur a suitcase and a stack of papers but did not explain anything about what had happened to Wilfredo while he was in HHS custody.

112.    Wilbur continued to notice changes in Wilfredo after they reunited in their family's home. Wilfredo was quiet and did not want to talk about what had happened in HHS custody. He also did not want to leave Wilbur. Wilbur would offer to take him to a nearby park to play with other children, but Wilfredo refused to go. Wilfredo feared being in any open space. He felt like someone was going to kidnap him and take him away from his father again. He was uncomfortable leaving their home—and Wilbur's side—at all.

113.    After he was reunited with Wilbur, Wilfredo struggled to sleep through the night. His body would shake as he tried to go to sleep. He would grind his teeth and wake up, afraid.

COMPLAINT
Case No. 3:21-cv-4457

The bruise and swelling on his head lasted long after his release.

114. The school year began months after Wilfredo was released from custody, but even then, he was afraid to leave his home and go to school. He still struggles to make eye contact and to express himself. Before the separation and his detention in HHS custody, Wilfredo expressed himself freely, but now he is much more reserved. Eventually, he told his father how he was sexually abused in custody. He continues to struggle with school and feels anxious when he has to leave his father to attend classes. Wilfredo has needed psychological support and therapy to cope with the separation and the sexual abuse that he suffered. Wilbur has observed that the separation and ensuing sexual abuse changed the personality and development of his son.

115. Wilbur also has continued to suffer physical and emotional effects from the trauma of his separation from Wilfredo, which have persisted even after he reunited with his son. Wilbur has little appetite, experienced stomach pains, and continued to experience the dry-heaving that had begun in Florence. He still feels stomach pain, nausea, and begins to dry-heave at times when he is forced to recall being separated from his son. At night, when he has been able to sleep, he has had nightmares. Wilbur feels like he had been normal before the separation, but that he has been physically and mentally different since then. He wants to go back to the way he had been before, but feels helpless. Wilbur has also received psychological help for the trauma of being separated from Wilfredo and being helpless as he learned of the abuse Wilfredo suffered during the separation. He has been prescribed medication.

116. Wilbur also continues to suffer from the effects of the infection in his feet that went untreated for weeks while he was detained. His feet and legs had not fully healed when he was released from detention, and he continued to apply medication to ward off infection. Now, years later, he still experiences pain after standing or walking for sustained periods of time. The injuries have impacted the type of work he can do because he cannot stand or work on his feet without experiencing pain and soreness. He cannot play sports with Wilfredo the way he used to.

117. Wilbur was not prosecuted for a crime during the foregoing events.

## 2. Erendira C. M. and Yasmin Alicia M. C.

### a. The government forcibly separates Erendira and Yasmin.

118. Erendira and Yasmin are from Guatemala. Their native language is Mam, an indigenous language primarily spoken in Guatemala. Erendira speaks some Spanish. Yasmin speaks a very limited amount of Spanish. In 2018, Erendira and Yasmin fled Guatemala for the United States, where they intended to seek asylum. They arrived at the U.S./Mexico border on or about May 11, 2018. Yasmin had celebrated her sixth birthday just two weeks before. Shortly after crossing the border, Erendira and Yasmin encountered U.S. immigration officials. Erendira and Yasmin peacefully identified themselves and surrendered to those officials.

119. The immigration officials asked Erendira and Yasmin for their documents. Erendira and Yasmin provided the officials with their birth certificates (Yasmin's birth certificate identifies Erendira as her mother) and Guatemalan identification cards. The immigration officials arrested Erendira and Yasmin and placed them in a car with other detained migrants. The immigration officials then transported Erendira and Yasmin to a *hielera*.

120. At the *hielera*, the Border Patrol agents instructed Erendira and Yasmin to stand against a wall and wait. Border Patrol agents took Erendira's and Yasmin's belongings, including their backpacks, dispossessing them of everything they had carried with them from Guatemala. Eventually, Erendira and Yasmin were called before a female Border Patrol agent. The agent spoke to Erendira in English (which Erendira does not speak) and in a few words in broken Spanish. The agent gave Erendira a form, printed in English, and gestured for her to sign it. Erendira initially refused and asked, in Spanish, for the agent to explain the document's contents. The Border Patrol agent grew impatient and kept pointing at the form, demanding Erendira sign it. Erendira repeatedly asked the agent questions about the form, to no avail, as the agent became increasingly agitated with Erendira. Erendira felt rushed and as though she had no option but to acquiesce to the agent's demand. She reluctantly signed the form.

121. The Border Patrol officer then began to tell Erendira, in barely comprehensible Spanish, Erendira's second language, that Border Patrol officers would take Yasmin away within the following one or two days. Erendira demanded to know why Border Patrol would do that, but

the only response she received was "*no sé*"—Spanish for "I don't know." Upon hearing this news, and not understanding why Border Patrol agents might separate her from her daughter, Erendira felt terrified.

122. Border Patrol agents then locked Erendira and Yasmin in a large holding cell. The cell was unbelievably crowded and extremely cold. Erendira and Yasmin would remain in that cell for about the next approximately thirty-six hours. They were not provided beds, mats, nor proper bedding. Instead, Border Patrol provided Erendira and Yasmin with two mylar blankets each—one to cover the floor, and one to place on top of themselves. The cell was so crowded, however, that neither Erendira nor Yasmin could find enough room to lay flat on the ground. Instead, they slept sitting against a wall.

123. The food in the holding cell was grossly inadequate. Twice a day, agents would enter with cold miso soup. It was inedible. The agents did not provide Erendira or Yasmin with any solid food. There was no bath or shower in the holding cell, and Border Patrol did not make any other means of bathing available to Erendira or Yasmin. Erendira and Yasmin lacked any means to change their clothing because the government had seized their belongings. So, for the entire time they were in the holding cell, they wore what they had on when they were arrested.

124. Erendira and Yasmin's cell was filled with other pairs of mothers and their children. Periodically, Border Patrol agents would enter the cell and call the names of another mother and her child. The Border Patrol agents would order the mother and child outside the cell. After a few minutes, only the mother would return, usually crying inconsolably. Neither Erendira nor Yasmin knew what happened to the children who did not return—if they were in the same building, who they were with, or when they might be returned to their mothers.

125. Seeing these children separated from their mothers caused Yasmin to sob uncontrollably and to cling to her mother. Each successive separation caused Erendira and Yasmin to feel increasingly anxious about whether, and when, they would be separated. Indeed, Yasmin asked Erendira if the same thing would happen to them. Desperate to comfort her child, Erendira (who had no idea when they would be separated or where the government would take Yasmin) told her daughter that she would be taken to a "better place" that had "food" and "beds."

1  Six-year-old Yasmin kept telling her mother that she was very afraid and that she did not want to
2  leave Erendira.

3    126.    Erendira and Yasmin had entered the *hielera* on a Friday, when they were first
4  placed in the holding cell. They remained in the holding cell, witnessing family separation after
5  family separation, throughout Saturday. On Sunday morning, the event that Erendira and Yasmin
6  had been dreading came to pass, as Border Patrol agents came to the cell and called out their
7  names. The agents ordered Erendira and Yasmin out of the cell. They took Erendira and Yasmin
8  to a room in the *hielera* that had a shower. A group of migrant parents were in the room with their
9  children. The agents ordered Erendira to bathe her daughter, telling her that she had five minutes
10  to do so. Temperatures in the facility were frigid, yet the shower (there was no bathtub) contained
11  only extremely cold water, making it hard for Erendira to bathe Yasmin. In the end, agents cut
12  short even those five minutes. They gave Erendira two pieces of uniform clothing to put onto
13  Yasmin. Erendira dressed Yasmin in the uniform.

14    127.    The Border Patrol agents demanded that the children in the room form a line. The
15  government agents put Yasmin in the line. Erendira asked a female Border Patrol agent leading
16  the line where the government was taking the children. As before, the agent told Erendira, "*no
17  sé*"—"I don't know." The agent began leading the line of children out of the room. Many of the
18  parents in the room pressed forward, trying to hug and protect their children. Border Patrol agents
19  restrained them. When Erendira, too, tried to grab ahold of her daughter, two Border Patrol agents
20  physically held her back from Yasmin. Both Erendira and six-year-old Yasmin were sobbing as
21  Border Patrol agents forced Yasmin to leave her mother behind.

22    128.    Border Patrol agents then marched Erendira back to the holding cell where she had
23  previously been detained. (The Border Patrol agents did not allow Erendira to bathe while she
24  was in the room with the shower.) The holding cell held a throng of crying mothers who had been
25  separated from their children at about the same time as Erendira and Yasmin. Erendira tried to
26  speak with other mothers in an effort to figure out what was happening to her and her daughter,
27  but the detained mothers' crying was so sustained that, for the remaining time that Erendira was
28

confined in the holding cell, she was unable to have a conversation with another person. Alone, she grew despondent over the prospect that she might never see her daughter again.

129. Throughout the events described above, Border Patrol failed to explain to Erendira or Yasmin what was happening to them. Border Patrol also failed to offer Mam interpretation to either Erendira or Yasmin, which might have helped Erendira or Yasmin understand whatever information the agents were attempting to communicate in English.

**b. Erendira is prosecuted, then held in immigration detention.**

130. Erendira remained in the holding cell for about two hours after the government separated her from Yasmin. Then, the government transferred Erendira to another detention facility. Initially, the reason for this transfer was unclear to Erendira because no government official explained the purpose for the transfer. She eventually came to understand that she was being charged with a misdemeanor criminal offense, a violation of 8 U.S.C. § 1325(a)(1), which prohibits entering the United States outside of an official port of entry.

131. Erendira was allowed to consult with a defense attorney, who determined that Erendira needed interpretation from English to Mam and arranged for her to have interpretation during her criminal proceedings. Erendira's questions to her appointed defense attorney focused not on the criminal charge that was pending against her but rather on her daughter's whereabouts. While the attorney could not tell her where her daughter was located, he explained that Erendira had two options in her criminal case: plead guilty, in which case she would be released within a day or two, or plead innocent, in which case she would receive a fine and be jailed for up to six months. Erendira had no money to pay a fine, and she believed that pleading innocent would make it impossible for her to find Yasmin. Believing that a guilty plea might buy her freedom and allow her to find her daughter, Erendira pleaded guilty.

132. After the guilty plea, the government immediately transferred Erendira back to the Border Patrol facility where she had initially been detained with Yasmin. The Border Patrol detained her there for two weeks, during which time she endured the same conditions described above: extremely cold temperatures, over-crowded holding cells, no bed or blankets, no ability to bathe, and no change of clothes. The only available meals were cold and inedible miso soup.

133.    At every opportunity, Erendira pleaded, as best she could in Spanish, with Border Patrol agents to give her information about her daughter. Oftentimes, the agents ignored her or answered her in English. The agents who did speak to her in Spanish told her that they didn't know anything about her daughter. Erendira thus continued to have no information about her daughter's whereabouts or well-being. Confined to her overcrowded holding cell, Erendira felt devastated, depressed, alone, and helpless. She cried often.

134.    Border Patrol agents threatened Erendira with deportation. Agents would enter Erendira's holding cell and tell the adults in it that they would be deported. On at least one occasion, an agent told Erendira directly and specifically that she would be deported to Guatemala and that Yasmin would remain in the United States. At this, Erendira demanded to call Yasmin's father, who then resided in the United States, to inform him of the circumstances. The agent refused to allow Erendira to use the telephone.

135.    Meanwhile, in the same detention facility where Erendira was detained, government agents continued to separate other pairs of parents and children. Erendira was aware of these separations—she was able to see or hear some of them as they occurred—with each such event re-traumatizing Erendira by reminding her of the circumstances under which Yasmin was taken from her.

136.    While detained in this Border Patrol facility, Erendira experienced physical symptoms in addition to the emotional distress that she suffered. She frequently had diarrhea and an upset stomach. She had severe and recurring headaches. She experienced menstrual irregularity.

137.    During the approximately two weeks she remained at this Border Patrol facility, Erendira never received interpretation from English (or Spanish) into Mam, even though the government had learned during her criminal proceedings that she required such services and provided them in that context.

138.    After detaining her in the Border Patrol facility for about two weeks, the government transferred her, without explanation, to a series of other detention facilities in Arizona. Eventually, government agents transferred her to an airfield. Agents shackled her and,

without explanation, placed her on an airplane with other detainees—men on one side of the plane, women on the other. Some of the male detainees said that they were being deported to Guatemala. The plane took off, and Erendira spent the entire flight, shackled, believing that she was being deported to Guatemala—without Yasmin.

139.     The flight did not go to Guatemala; it went to Georgia. Only after landing somewhere near Atlanta did Erendira come to understand that she was still in the United States.

140.     Thereafter, the government detained Erendira in a detention facility, somewhere around Atlanta, for several weeks. While she was detained there, Erendira repeatedly begged government agents for information about Yasmin. The agents responded by saying that they did not know where Yasmin was located.

141.     One day, about three weeks into her detention at the Georgia facility, a guard escorted Erendira to a room with a telephone. There, the guard told Erendira that she could speak to Yasmin. Erendira picked up the phone and first spoke with a social worker. The social worker said that Yasmin was in a facility for children in New York and was very sad. The social worker asked Erendira to console her daughter. The social worker then put Yasmin on the phone. Yasmin was crying uncontrollably. When she was able to speak, Yasmin stammered that she wanted her mom. Erendira did what she could to calm her daughter. Her efforts were limited not only by the distance but also the fact that the government allowed Erendira to talk to her daughter for only two to three minutes. While she was on the call, hearing her daughter's sobs reinforced the already severe emotional distress that Erendira was suffering.

142.     Besides this single phone call, during which both Erendira and Yasmin were so consumed with grief that they could not effectively communicate, the agents detaining Erendira and Yasmin offered no other opportunities for contact and provided Erendira with no other information about her daughter's well-being until their eventual reunification, weeks later.

143.     While she was detained in Atlanta, Erendira wanted to call Yasmin's father, Erendira's long-term partner (and now husband), who lives in Oakland, to explain the situation to him. But the government charges fees to make calls, and Erendira had no money. Erendira begged another detained woman to assist her; eventually, the other detainee allowed Erendira to

COMPLAINT
Case No. 3:21-cv-4457

use some of her own limited resources to allow Erendira to call Yasmin's father. During the brief call, Erendira explained that she was somewhere near Atlanta and that Yasmin had been taken from her. This led Yasmin's father to begin searching for her. But despite his efforts to locate Yasmin and arrange for her to come live with him, the government did not release Yasmin to her father.

### c.      Yasmin's ORR detention.

144.     After the government separated Yasmin and Erendira, and while Yasmin was still in Arizona, the government facilitated a phone call between Yasmin and a close relative. On information and belief, from this point forward, the government had sufficient information to ascertain that Yasmin's father lives in Oakland and that he was ready and willing to take custody and care of Yasmin—and was fully capable of doing so. Yet, instead of facilitating Yasmin's reunification with her father, the government shipped Yasmin to New York, where the government detained Yasmin in a facility for UACs.

145.     While in the New York facility, Yasmin was depressed. She cried frequently. She asked for her mother. The officials running the facility did not provide Yasmin with any information about Erendira. Yasmin spent much of her time alone with other children. She felt unsupervised by adults. To this day, Yasmin struggles to discuss her time living in the New York facility, and cries when recalling her life there.

146.     During the several weeks that Yasmin lived in the New York facility, she spoke to her mother only once, as described above, even though both mother and daughter were in government custody. On information and belief, she did not speak to her father, even though, as described above, both Erendira and Yasmin had provided government officials with more than enough information to aid the government in locating Yasmin's father.

### d.      Erendira and Yasmin are reunified.

147.     After detaining her for several weeks in the Atlanta detention facility, the government transported Erendira back to an airfield. No agent told Erendira where she was going, and Erendira once again feared that she was being deported without her daughter. She cried throughout the flight, thinking about Yasmin.

148.     As before, Erendira learned only upon landing that she was still in the United States. She had been transferred to yet another detention facility, this time in Texas. After being detained there for about a week, government officials brought Yasmin to Erendira. On information and belief, this occurred on or about July 24, 2018—approximately ten weeks after the government separated Erendira and Yasmin.

149.     Erendira and Yasmin were released from government custody. A religious charity helped arrange for transportation to California, where Yasmin's father lives.

### e.     The forcible separation continues to harm Erendira and Yasmin today.

150.     Even after their family was reunified in California, Erendira and Yasmin have continued to suffer emotionally as a result of their forcible separation. Yasmin often physically clings to her mother and refuses to let go of her. Yasmin did not behave this way prior to her separation from Erendira. Yasmin cries in her sleep, and, especially during the first year after the family's separation, would often scream in her sleep. When Yasmin sees a police officer, she gets very scared. If she sees a police officer when in a car, she sits straight up and double checks to make sure that her seat belt is on, so that the police officer cannot remove her from the car and her mother's care.

151.     When she first arrived in California, Yasmin refused to go to school. She thought that she was being taken away from her mother, again. Yasmin still expresses some reluctance at being separated from her mother during the school day.

152.     Erendira continues to suffer as well. She frequently gets headaches, more than she did prior to her separation from Yasmin. She cries when she relives her experience in detention. She and Yasmin have attended some psychological counseling that has been arranged for them. Erendira believes that the counseling has aided their recovery to some degree.

### 3.     Joshua G. G. and Karl Luis G. G.

#### a.     The government forcibly separates Joshua and Karl.

153.     Joshua and his son Karl are from Guatemala. Their first language is Mam. In 2018, they fled Guatemala to seek asylum in the United States. When they came to the United States,

1666577

Joshua was able to speak and read only a limited amount of Spanish. Karl could not speak or read Spanish. Neither Joshua nor Karl spoke or understood English. At the time, Karl was thirteen years old.

154. On or around the morning of May 18, 2018, Joshua and Karl entered the United States in or around San Luis, Arizona. They approached a group of Border Patrol officers who were sitting in a vehicle to surrender themselves, ask for help, and seek asylum. When the Border Patrol officers got out of their vehicle, Joshua expressed to them that he and his son needed help and were seeking asylum. The officers asked what language Joshua and Karl spoke. Joshua responded that they spoke Mam. The officers then asked whether Joshua and Karl spoke Spanish. Joshua answered that he understood very little Spanish.

155. The Border Patrol officers asked Joshua and Karl a series of questions, took notes, and asked for their identification. Joshua had difficulty understanding them. Joshua did not understand the officers to have asked about his and Karl's health or well-being. After reviewing their documents, one Border Patrol officer told Joshua and Karl that he had "some very bad news" for them. Frightened about what the officer could mean, Joshua asked the officer to explain. The officer responded only: "You'll know soon." Upon hearing the officer's haunting response, Joshua looked to his son Karl and could already see that a sadness had overcome him. The officers said little else, but told Joshua and Karl they were being arrested and taken to a jail.

156. Joshua and Karl were ordered to enter one of the Border Patrol officers' trucks. Before loading them together into the back-cabin compartment of the truck, the Border Patrol officers confiscated all of their belongings—a backpack containing clothes and water. The officers threw these items, including Joshua and Karl's water supply, into what looked like a garbage bag. The temperature outside was already hot and increasing, but the officers did not provide Joshua and Karl any water or food, turn on any air conditioning in the back cabin, or ask about their well-being. During the entirety of the approximately 30-minute drive from the site of their arrest to the first detention facility, Joshua and Karl sat in the sweltering heat of the CBP vehicle, terrified of what awaited them next.

157.     The Border Patrol officers pulled up to a *hielera*[81] and led Joshua and Karl to a room inside. Officers booked Joshua and Karl into the facility and took away the jackets that Joshua and Karl wore, leaving them in their t-shirts. Border Patrol officers collected information from Joshua and Karl, entered it in a computer system, and took their fingerprints. The Border Patrol officers there asked what language Joshua and Karl spoke. Joshua again stated that they spoke Mam, yet, again, the officers did not respond to this or provide any Mam interpretation. As a result of Joshua's limited Spanish proficiency, he did not understand many of the processing officers' questions or statements. In addition, the officers' Spanish sounded strange and unclear to Joshua. Joshua answered their questions as well as he could, but was concerned that he could not fully express himself to the officers, or understand the officers, in Spanish.

158.     By the time the officers finished speaking to Joshua and Karl, about ten arriving parents and their children had been gathered into the room. Another officer entered the room and announced in Spanish to all of the parents: "We will have to separate you from the children." The officer also told Joshua and the other parents that they would remain detained and then be returned to their countries "or wherever you [*i.e.*, the parents] came from." The officers' blunt words terrified Joshua and rendered him and the other parents around him speechless. Joshua believed he had no power to respond to or question the officers. He began to cry. He immediately feared that he would be forced to return to the country he and Karl had fled for their lives, while Karl would remain in the United States without him.

159.     Despite his terror, Joshua gathered strength to comfort his son before the officers took him away, telling him not to worry and that they would "get out of here together." Karl could not speak in what came to be his final moments with his father before he was removed from his father's arms. He cried as the officers took him and the other children who were also forcibly removed from their parents.

160.     CBP officers took Joshua to a holding cell while other Border Patrol officers led Karl, along with other children being separated from their parents, away to a different holding

---

[81] Joshua would later hear various people in the building use the word "Yuma" to describe this CBP detention facility. On information and belief, these people were referring to the Yuma Border Patrol Station located in Yuma, Arizona.

cell. Neither Joshua nor Karl understood why they were being separated or what exactly would happen to them next. Recalling the "bad news" that the arresting Border Patrol officers had referenced, Joshua continued to weep over the fact that he was losing his son. Karl worried that he would not be able to see his father again and experienced anxiety stemming from not knowing where his father was, where he and his father would be taken next, and when, if ever, they would be reunited.

### b.     Joshua and Karl are detained apart.

161.    After forcibly separating him from Karl, Border Patrol continued to detain Joshua in horrific conditions. The *hielera* where Joshua was held was a large, windowless cement or concrete room with two benches. There were no beds, cots, or other places to rest. The room was filthy with waste and grime. The temperature was kept extremely low. The officers provided Joshua only a thin mylar blanket, which did not keep him warm or provide him any comfort. Because the Border Patrol officers had confiscated Joshua's jacket, he was left in only his t-shirt and jeans. The cell was extremely over-crowded. There was no space to sit or lie down. Joshua felt cold and spent much of his time standing, hoping the other detainees might shift around enough to free up some floor space where he could squeeze in to briefly rest his body.

162.    The crowding extended into the toilet area of the cell. The toilets were separated by low dividers and had no doors that might afford the men using them any privacy. When Joshua and the other men would use the toilet, they were fully visible to everyone else crammed on the floor and benches outside of the stall. Joshua experienced great shame, humiliation, and discomfort every time he used the toilet.

163.    Border Patrol officers did not provide Joshua any clean or additional clothing. Joshua knew he had additional clothing in his backpack; however, the Border Patrol officers did not return any of that clothing to Joshua so that he could wear it to feel warm or clean. Joshua never received soap, toothpaste, a toothbrush, or other personal hygiene products. He was never permitted to shower, bathe, or otherwise clean himself.

164.    The only sustenance the officers provided Joshua in the *hielera* was instant soup about three times per day. The water in the instant soap was lukewarm and the noodles were still

raw. For water, Joshua and the other detained men were forced to drink from the dirty, foul-smelling sink faucets next to the toilets—the same faucets the men used to wash their hands after going to the bathroom. Border Patrol officers did not provide Joshua any bottled or other sanitary potable water.

165.    To the minimal extent that Border Patrol officers communicated with Joshua during this time, they did so in Spanish. The officers barely interacted with Joshua, making him feel as if he were less than human or didn't exist at all. The officers did not allow Joshua and Karl to interact while they were separated in the *hielera*, nor did the officers provide either Joshua or Karl with any information about each other. Joshua did not know what was happening to his son or whether he was even still in the same facility anymore.

166.    After two full days of separation in the *hielera*, Joshua briefly glimpsed Border Patrol officers marching Karl past Joshua's cell. The officers did not allow Joshua to talk to Karl, who appeared to be leaving the facility. None of the guards or other Border Patrol personnel told Joshua where Karl was going, how to get in contact with him, when they would be reunited, or even acknowledged the fact of their separation. Similarly, no officials told Karl anything about where he was going, where his father was going, or when he would see his father again. This is the last time father and son would see each other for approximately two months.

167.    After seeing his son removed from the *hielera*, Joshua grew increasingly nervous and anxious. He did not know when—or even whether—he would see his son again. He did not know how his son was being treated or how his son was handling their sudden separation in this foreign detention facility. Likewise, Karl was terrified; Border Patrol officials did not tell him what would happen to him next, where the officials were taking him, or when he would see his father again.

168.    Joshua remained in this first *hielera* for what felt like over a week. No one told him anything about what had happened to Karl. Joshua became even more saddened and his mind raced with worries and thoughts about his son's safety and his own. He constantly cried and prayed for his son. He watched as other fathers who had just been separated from their children wept and prayed for their safety and return, which, in turn, increased Joshua's own despair.

Joshua could not stop wondering about Karl, whether he was healthy and well, and what he was doing at any given moment. He felt consumed by his concern that he would be sent back to Guatemala without Karl or any information about how to reunify with him. Joshua promised himself that if an officer ever tried to force him to sign for his own deportation, he would refuse; he resolved to fight to remain until his son Karl returned to him.

169. Along with his mental health, Joshua's physical health worsened during this time. He developed constant, painful headaches. He came down with a cold, cough, and fever. His whole body was constantly tired, aching, and painful from having to stand for long periods of time or lie on the hard floor due to the extreme over-crowding in the *hielera*. The government did not screen Joshua for medical needs or provide him medical attention. The degrading way the officers treated him and the terrible conditions in the *hielera* convinced him he had no right to ask for help.

170. Joshua was never charged with any crime related to his entry into the United States.

171. After what felt like 10 or 12 days, a Border Patrol officer called Joshua and a group of other men's names and led them out of the *hielera*. The officers fastened chains around Border Patrol and the other detained men's waists and locked them at their wrists and ankles. The officers never explained why they were doing so or where they were taking Joshua and the other men. The officers led Joshua and the men into a van and drove them from the initial *hielera* to the next detention facility. During the approximately 45-minute drive, the officers kept the air conditioning on so high the men cried out with discomfort.

172. Joshua was taken to a second *hielera*, where, again, the government failed to provide Joshua with any Mam interpretation. The holding room where the government detained Joshua and about twenty other men was essentially a smaller version of the first. The men all shared a single toilet. The officers provided Joshua another thin mylar blanket which did not keep him warm in the frigid *hielera* temperatures. The officers again provided Joshua no personal hygiene supplies and did not give him an opportunity to shower or otherwise clean himself. Joshua could not change into new clothes or wash the old ones he had been wearing, by then, for

1666577

nearly two weeks. The officers again gave Joshua only lukewarm, uncooked instant soup to eat about three times per day.

173. Joshua spent what felt like over a week in the second *hielera*. During this time, he worried and cried constantly. His painful headaches persisted. He could not control his mind as it raced between his fear of being deported and his worries about his son's whereabouts and well-being. He anxiously awaited the moment he would be released and could search for Karl.

174. Eventually, officers summoned Joshua and a group of other men and led them out of the cell. The officers shackled the men again and ordered them into a large bus. Once again, no one explained to Joshua where he was being taken or what had become of his son. Joshua spent approximately three hours on the bus before it arrived at a third detention facility.

175. Joshua spent what felt like just under a week at this third detention facility. The facility was large and looked more like a jail or prison to Joshua than the two *hieleras*. The detained individuals there wore blue and red uniforms and slept in bunk beds.

176. When Joshua arrived at the facility, officers took down his biographical information. When the officers asked Joshua for his best language, Joshua told them he spoke Mam. Nevertheless, no one provided Joshua Mam interpretation during his time at that facility. The officers spoke to him only in Spanish.

177. Joshua was only then allowed to change out of his clothes and shower for the first time since he and Karl had been arrested more than two weeks before.

178. Joshua was detained in a large holding cell with about 300 other men. They were permitted to leave the area only twice per day, and then only in shackles. The guards generally did not speak or communicate with Joshua. Immigration officials told him nothing about his son's whereabouts, nor did they tell him whether or how his son could locate Joshua.

179. Desperate to communicate with his loved ones, Joshua requested a phone call from the detention officers. The officers granted Joshua a single five-minute call. Joshua called his sister, who lived in the United States. During their brief conversation, Joshua explained that he had been forcibly separated from Karl and that he was still detained. Joshua's sister explained that a social worker had called to inform her that Karl was alive and in Phoenix, Arizona—

1666577

information that the government had not provided to Joshua. The officers did not allow Joshua any further phone calls at this facility.

180. Joshua's days at the third facility were marked by sadness and depression. He had no further information about his and his son's future or his son's condition, causing him intense worry. His painful headaches persisted.

181. After Joshua spent about a week or more at this third facility, officers removed him and a group of other men from their cells, shackled them again, and loaded them into a large bus. The officers provided them no information about what would happen to them next or about their children. After around half an hour, the bus arrived at an airport and officers had Joshua board a plane. The flight lasted between approximately three and four hours. Joshua was not provided information on the destination, but believes it was either in Texas or Louisiana.

182. Over the next three or four weeks, Joshua was detained in at least two additional detention facilities. Despite telling officials at these facilities that he spoke Mam, Joshua never received any Mam interpretation. Indeed, these facilities did not even provide Spanish interpretation. Joshua had to rely on a few other detainees who spoke some English and Spanish to gain basic information about his surroundings. About 40 days after his separation from Karl, people who identified themselves as social workers arrived at the detention facility and spoke to Joshua and a group of other separated fathers. Although the social workers asked Joshua what language he spoke and he replied that he spoke Mam, they did not respond or provide him any Mam interpretation. The social workers asked Joshua whether he had been able to speak to his child yet and he answered that he had not. Joshua would often have to ask the social workers to repeat themselves in Spanish over and over for him to get a basic understanding of what they said. He left his conversation with the social workers feeling he did not understand much of what they told or asked him. At some point, the social workers or immigration officials told Joshua that he could possibly be reunited with Karl but that it was unclear where his son was. The idea that the government could not identify where his son was located terrified Joshua, further increasing the already severe level of anxiety he felt and making him feel ill. The government provided Joshua with a form so that the government could collect biographical information about Karl.

COMPLAINT
Case No. 3:21-cv-4457

1    Joshua filled it out, understanding that the government needed this information to identify and

2    locate Karl.

3        183.    About a week after the social workers' visit, an officer called Joshua out of his cell

4    and told him that Karl had been located in a children's shelter in Arizona. The officer then told

5    Joshua he would have 10 minutes to speak to his son on the phone.

6        184.    Joshua and Karl heard each other's voices for the first time since they were

7    separated. Joshua immediately cried as he spoke into the phone and could hear Karl had also

8    begun to cry. But then, the immigration official supervising Joshua yelled at him, telling him he

9    could not speak to his son in Mam. This horrified and saddened Joshua because he knew that he

10   would be unable to comfort his son or learn how Karl was feeling by speaking in Spanish, which

11   neither Joshua nor Karl spoke proficiently. Joshua used a few Spanish words he thought Karl

12   might understand, and—though he was terrified of drawing the nearby official's attention—he

13   included just a few Mam words that he thought might comfort Karl. Even so, Joshua and Karl

14   could barely speak to each other through the language barrier enforced by the government. With

15   difficulty through his tears and surging emotions, Joshua managed to tell his son not to worry and

16   that they would be together again soon. Karl could barely speak because he was crying intensely.

17   He could only ask how his father was doing. The officer then grabbed the phone from Joshua and

18   told him his ten minutes had elapsed.

19       185.    After the initial call, Joshua was only permitted to have calls with Karl every

20   Thursday, each limited to ten minutes. The officers maintained the short time limit rigidly, taking

21   the phone from Joshua just as ten minutes elapsed without explaining why the call duration was

22   so brief. Including their initial call, Joshua and Karl spoke only about four times during the two

23   months of their separation. Joshua would eagerly await Thursdays so he could learn more about

24   how his son was doing, but Karl said little about where he was or what was happening to him on

25   the calls. Instead, Karl would ask Joshua whether they would be reunited, and when.

26       186.    Joshua would later learn that Karl was not provided any Mam interpretation while

27   in ORR custody. Any services or communications Karl received from facility or government

28   personnel while in ORR custody were in Spanish, a language Karl could not understand. Karl

COMPLAINT
Case No. 3:21-cv-4457

therefore spent about two months without his father and in total linguistic isolation, unable to communicate in the only language he knew.

187.     After a few weeks, the social workers returned and once again told Joshua and the other separated parents they would have the chance to be reunited with their children. The social workers told the parents they would need to go back to Arizona. No one—neither the social workers nor immigration officials—provided Joshua with any information about the potential reunification process, including how long parents would have to wait to see their children again. Joshua had no recourse to call anyone or seek any information about the process. Joshua spent the rest of this time anxiously waiting. He felt the only choice he had was to wait for his name to be called to travel to Arizona. No one—social workers or any officials—gave Joshua information about Karl.

### c.     Joshua and Karl are reunited.

188.     About two to three weeks after his initial call with Karl, Joshua was transported by plane to immigration custody in Arizona. He waited about three to five more days in yet another detention facility where he agonized over the protracted delay in being reunited with his son. Joshua suffered continued headaches and anxiety about when and how he would see Karl.

189.     Immigration officers then filled a van with Joshua and a group of about ten other separated fathers. The officers told the fathers that they were being transported to another facility in Phoenix and would reunite with their children there. Joshua arrived at the facility in the evening. This facility appeared like the initial two *hieleras* where CBP officers had held Joshua. The officers told the fathers to wait there for their children.

190.     After about two to three hours at this facility, Joshua saw officials lead in Karl and a group of other children. Joshua watched as the fathers who arrived with him in the van were reunited with their children. Joshua was overjoyed to see and hold his son Karl again. Father and son cried in each other's arms. Although Joshua felt a great sense of relief, he noticed that Karl looked very different from the last time he had seen him. Karl's skin was pallid, and he acted differently than his father remembered. In the moments after their reunification, no officials or facility staff asked Joshua and Karl about their health or well-being.

191.    Reunification did not end Joshua and Karl's nightmare. Instead, late in the evening or early the next morning, officials ordered them onto a large bus full of other fathers and their children and drove them to an airport. The officials did not explain why.

192.    Joshua and Karl were flown to and detained at the ICE Karnes County Residential Center ("Karnes") in Karnes City, Texas. The father and son spent about an additional 20 days detained there. This time at Karnes was particularly difficult for Karl. Joshua watched as his son's mental health continued to deteriorate. Joshua saw Karl sit alone and repeat to himself through tears: "I shouldn't be here." It pained Joshua to see how much his son had suffered. Karl was lethargic and had trouble eating the food at Karnes. Although Karl was seen at a clinic for what Joshua believed was a general check-up, Joshua was never examined by a health worker. Joshua felt ill during this time. He suffered from continuous headaches, cold symptoms, and fever. At one point after he asked officials at Karnes for some medication to alleviate his symptoms, officials said they would bring him something but never did.

193.    After about 20 days at Karnes, immigration officials contacted Joshua's sister and instructed her to purchase travel accommodations for Joshua and Karl so that they could be released to her. After Joshua's sister paid for the travel expenses, immigration officials released Joshua and Karl in about mid-August 2018. By the time of their release, Karl and Joshua had remained detained for nearly three months.

### d. The forcible separation continues to harm Joshua and Karl today.

194.    Joshua and Karl continue to suffer severe emotional distress even after their reunification. Despite being relieved and happy to see his son again, Joshua observed immediately that Karl had been fundamentally changed by his detention and separation. Karl was a different person, and to this day is not the same. Whereas Karl was previously a gregarious young boy who spoke a lot and had a normal grasp of language, since the separation, he often speaks to himself and struggles to respond to even basic questions asked by others. Karl's behavior often suggests that he doesn't understand his surroundings or where he is. He often responds to questions only after being physically touched and prompted to speak. Karl has

1    experienced trouble sleeping and headaches.

2        195.    Karl, now sixteen, also has been fearful ever since the forcible separation. He is

3    especially afraid to be alone or apart from Joshua. He is afraid when Joshua leaves and, although

4    he is now a teenager, often has to be accompanied when in public, such as when walking to

5    school.

6        196.    Joshua also still has not recovered from the trauma of his detention and forced

7    separation from his son. When first released, Joshua often felt like he was still in detention and

8    would cry over the stress of his experience being detained with no knowledge of where Karl was

9    or whether Karl was safe. Joshua continues to feel deep pain from the entire separation and

10   detention experience, including when he must remember or talk about what happened to him and

11   his son. He continues to suffer headaches. He feels fearful in his daily life. He has had trouble

12   sleeping and talked in his sleep. He loses sleep, sometimes waking up in the middle of the night

13   thinking he is still being detained and separated from Karl.

### C. The United States violated the Constitution and multiple mandatory legal obligations when it separated the Plaintiff families and during their detention.

16       197.    As multiple government officials recognized, the sole purpose of the Policy and

17   the separations that occurred as a result was to reduce the number of asylum seekers in the United

18   States by coercing newly-arrived asylum seekers like the Plaintiffs into abandoning their lawful

19   claims and by deterring future asylum seekers from attempting to exercise their right to seek

20   asylum in the United States for fear that doing so would result in the loss of their children.

21   Federal courts that have assessed the Policy's constitutionality have concluded that the

22   government's motivation was constitutionally impermissible.[82]

23       198.    Court decisions that assessed the Policy's constitutionality drew upon a long and

24   well-established line of constitutional case law. The Supreme Court has consistently recognized

---

[82] *See Ms. L. I*, 302 F. Supp. 3d at 1165 (finding that separated plaintiff families, including those in DHS custody after conviction of a misdemeanor border crossing offense, were "victims of a wide-spread government practice" instituted for "no legitimate reason"); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 121 (D.D.C. 2018) (finding that "nothing in federal law suggests that deterring immigration by indefinitely separating families once parents have been transferred to immigration custody is a compelling or legitimate government objective").

that the parent-child relationship is constitutionally protected[83] and that it is constitutionally important for children to remain with their parents.[84] These constitutional protections extend to citizens and non-citizens alike, even when confined by the government.[85]

199.    The Policy also violated statutory and regulatory duties imposed upon government officials. By separating the Plaintiff families, CBP violated mandatory policies set forth in the U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search ("TEDS"), which "govern[s] CBP's interaction with detained individuals" and implements "key regulatory and legal requirements" for CBP.[86] TEDS requires that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation."[87] No law or regulation required the government to separate the Plaintiff families. Moreover, on information and belief, the government never had or demonstrated a reason for concern that the Plaintiff parents posed any risk to the Plaintiff children, or that the Plaintiff families posed any safety or security concern whatsoever.

200.    In addition to preserving family unity, CBP agents had a duty to "consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation."[88] Given the well-documented damage

---

[83] *See, e.g., Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–233 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923).

[84] *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligation the state can neither supply nor hinder.").

[85] *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 500 (D.D.C. 2018); *Ms. L. II*, 310 F. Supp. 3d at 1144–46 ("A practice of this sort implemented in this way is likely to be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience, . . . interferes with rights implicit in the concept of ordered liberty. . . and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency." (internal quotation marks omitted and cleaned up)); *see also C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020) (finding plaintiffs in a family-separation case had "plausibly alleged that the government's separation of their families violated their constitutional rights").

[86] *See* Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search (2015) [hereinafter TEDS] at 3, https://perma.cc/C8TC-QWH7.

[87] *Id.* at 4.

[88] *Id.*

that separation from their parents would cause to the Plaintiff children, Border Patrol agents and other government officials violated this duty when they separated the Plaintiff families and failed to make even basic efforts toward their reunification.

201.    Federal statutory law protects each individual immigrant's right to apply for asylum in the United States.[89] By conditioning Wilbur's ability to reunify with his son on the abandonment of his asylum claim and acceptance of deportation, as described in detail above, federal agents violated federal laws that require that an immigrant's decision to withdraw his or her asylum application be "voluntary."[90] As a constitutional matter, separating the Plaintiff families to impede their access to asylum also violated their due process rights.[91]

202.    While Yasmin and Karl were in ORR custody, they had available, non-detained family members able to provide care for them in a non-detained setting. Thus, by failing to promptly reunite Yasmin with her father, or Karl with his paternal aunt, the United States violated the *Flores* settlement and 8 U.S.C. § 1232. The *Flores* settlement governs the government's treatment of detained immigrant children. Section 1232 codifies certain related governmental obligations owed to detained immigrant children. The *Flores* settlement requires that, where the government "determine[s] that the detention of the minor is not required either to secure his or her timely appearance before [immigration officials] or the immigration court, or to ensure the minor's safety or that of others, the [immigration officials] shall release a minor from its custody without unnecessary delay." Section 1232(c)(2)(A) imposes upon ORR a statutory responsibility to "promptly" place certain detained immigrant children "in the least restrictive setting that is in the best interest of the child." Under both the *Flores* settlement and Section 1232, the most

---

[89] 8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such alien's status, may apply for asylum . . .").

[90] *See* 8 C.F.R. § 235.4 (an immigrant's "decision to withdraw his or her application for admission must be made voluntarily"); *see also Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 863 (S.D. Cal. 2019) (finding petitioner's choice to withdraw her asylum claim was not voluntary because "she made her decision as a result of the continued separation from her child").

[91] *Ms. L. I*, 302 F. Supp. 3d at 1166–67 (denying the government's motion to dismiss plaintiffs' due-process claim on the grounds that the government was using separation as a way to deter lawful asylum seekers).

preferred placement for a child is with that child's parent. Relatives such as aunts are another preferred class of family members who can sponsor a child's release from immigration detention.

203. Yasmin and Karl fall within the class of children who are protected by the *Flores* settlement and Section 1232. Yasmin's father was available in the United States to care for her while she was detained in New York. Karl's paternal aunt was available in the United States to care for him while he was detained in Arizona. The government failed to release Yasmin and Karl to their relatives' custody, thus violating its non-discretionary obligation to "promptly" and "without unnecessary delay" reunify Yasmin with her father and Karl with his aunt.

204. By pressuring Wilbur, who is a national of El Salvador, to accept deportation and abandon his claim for protection, federal agents also violated the permanent injunction in *Orantes-Hernandez v. Gonzalez*.[92] The *Orantes* injunction remedied immigration agents' longstanding and unlawful practice of lying, manipulating, and coercing Salvadoran migrants into abandoning their asylum claims and protects a class of Salvadoran citizens and nationals in DHS custody who are eligible to apply for asylum. The *Orantes* injunction mandates that, after a class member has expressed a fear of returning to El Salvador, DHS officials "shall not advise, encourage, or persuade the class member to change his or her decision" and "shall not employ threats, misrepresentation, subterfuge or other forms of coercion."[93] As described in detail above, CBP and ICE agents repeatedly sought to use the prospect of reunification to pressure Wilbur— and by extension, Wilfredo—into abandoning his asylum claim after he had expressed fear of returning to El Salvador, in violation of the *Orantes* injunction.

205. Furthermore, during the Plaintiff families' detention, federal agents subjected them to harsh and cruel treatment in custody, in violation of the United States Constitution and multiple mandatory federal policies.

206. The Constitution mandates that the government meet the basic human needs for

---

[92] *See Orantes-Hernandez v. Gonzalez*, Modified, Consolidated Injunction, No. 2:82-cv-01107-MMM-VBK, ECF No. 855 at 3 (C.D. Cal. Nov. 26, 2007).

[93] *Id.* at 1.

sleep, food, water, sanitation, medical care, and reasonable safety of anyone in custody.[94] These standards apply to civil detention in the *hieleras*, where the Plaintiff families were detained and separated.[95] The conditions of confinement to which CBP subjected the Plaintiff families in the *hieleras* where they were detained, described in detail above, violated these longstanding constitutional standards. In subjecting the Plaintiff children, in particular, to inhumane and unsafe conditions in CBP *hieleras,* where government agents held them in unsanitary cells and deprived them of adequate food, clean drinking water, adequate bedding, and sufficient space to sleep, the government violated federal law and policy requiring that minors be held in "facilities that are safe and sanitary," and that account for "the particular vulnerability of minors."[96]

207.   The conditions to which CBP subjected the Plaintiff families in the *hieleras* also violated numerous mandatory, non-discretionary obligations set forth in CBP policy in place at the time. For example, TEDS 4.13, on "Food," mandates that "[f]ood and water should never be used as a reward, or withheld as punishment" and "[f]ood provided must be in edible condition."[97] As described in detail above, CBP agents explicitly withheld food as punishment from the Plaintiff parents and repeatedly served inedible, uncooked ramen noodles to the Plaintiff parents in direct violation of these policies. TEDS also requires that "[f]unctioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees."[98] CBP's failure to provide clean water and drinking cups to the Plaintiff families

---

[94] *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Thomas v. Baca*, 514 F. Supp. 2d 1201, 1216 (C.D. Cal. 2007) (holding, in the more restrictive criminal custody context, that "requiring inmates to sleep on the floor deprives them of a minimum measure of civilized treatment and access to life's necessities because access to a bed is an integral part of the 'adequate shelter' mandated by the Eighth Amendment").

[95] *Doe v. Kelly*, 878 F.3d 710, 725 (9th Cir. 2017) (upholding preliminary injunction requiring improvements to conditions in *hieleras* in Arizona); *Unknown Parties v. Nielsen*, No. CV-15-00250-TUC, DCB, 2020 WL 813774, at *19-22 (D. Ariz. Feb. 19, 2020) (same case; after bench trial, entering permanent injunction requiring conditions improvements in certain Arizona *hieleras* on constitutional grounds).

[96] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997); *see also* U.S. Customs & Border Prot., *U.S. Border Patrol Policy: Hold Rooms and Short Term Custody* (2008), https://perma.cc/8MQA-53QV; *Flores v. Barr*, 934 F.3d 910, 912-13 (9th Cir. 2019).

[97] TEDS at 18, https://perma.cc/C8TC-QWH7.

[98] *Id.*

1666577

violated this directive.

208.    Under TEDS, "[a]ll instructions and relevant information must be communicated to the detainee in a language or manner the detainee can comprehend."[99] Yet, as described in detail above, CBP officials consistently failed to communicate with the Plaintiff families in the languages they understood and refused to translate English-language documents that they insisted that the Plaintiff parents sign, all in violation of mandatory policy. CBP agents also failed to ascertain that Plaintiffs Erendira, Yasmin, Joshua, and Karl lacked sufficient proficiency in Spanish to receive critical information in that language, failed to ascertain that these Plaintiffs needed interpretation into Mam, and failed to provide English/Mam interpretation.

209.    TEDS also requires that "CBP employees must speak and act with the utmost integrity and professionalism. CBP employees must conduct themselves in a manner that reflects positively on CBP at all times."[100] As described in detail above, CBP officers violated these standards in myriad ways, including by insulting the Plaintiff parents and the other individuals in custody with them, mocking them, threatening them with deportation without their children, and imposing dehumanizing and arbitrary rules—like forbidding people in custody from making eye contact with guards, and making derogatory and unprofessional comments about immigrants.

210.    CBP officers have a duty to report and seek medical treatment if a person in custody presents a medical issue. Specifically, TEDS requires that, at the time of transport, "Officers/Agents must be alert to medical symptoms such as coughing, fever, diarrhea, rashes or emaciation, in addition to obvious wounds, injuries, cuts, bruising or bleeding, heat related injury or illness, and dehydration. Any observed or reported injury or illness must be reported, and appropriate medical care must be provided or sought in a timely manner."[101]

211.    Once an individual is in custody, "officers/agents must ask detainees about, and visually inspect for any sign of injury, illness, or physical or mental health concerns and question the detainee about any prescription medications. Observed or reported injuries or illnesses should

---

[99] *Id*. at 4.

[100] *Id*.

[101] *Id*. at 5-6.

be communicated to a supervisor, documented in the appropriate electronic system(s) of record, and appropriate medical care should be provided or sought in a timely manner."[102] On information and belief, no CBP officer at any time inspected or recorded Wilbur's serious and deteriorating injuries, even though Wilbur reported the injuries and sought medical care. As described in detail above, at no point when Wilbur was in CBP custody did any officer provide or refer him to any medical care, all in violation of CBP policy.

212. The Family-Separation Policy artificially increased the number of UACs in ORR custody by intentionally separating accompanied children, like the Plaintiff children, from their parents. However, the government failed to prepare for the exponential increase in children ORR would need to detain as a result.[103] ORR was particularly unprepared for "tender age" children under 12, like Yasmin and Wilfredo. As a result, the government ignored applicable child welfare standards in violation of its mandatory duties.

213. For example, the government detained Plaintiffs Yasmin and Karl in near-total linguistic isolation for nearly two months, despite the requirement that services be provided "in a manner which is sensitive to the . . . native language and the complex needs of each minor."[104] The government also failed to ensure that Wilfredo was protected from sexual assault in custody, and subsequently failed to provide him appropriate treatment and support after he was assaulted.

//

//

//

---

[102] *Id.* at 14.

[103] U.S Dep't of Health and Human Services, Office of the Inspector General, *Separated Children Placed in Office of Refugee Resettlement Care* (Jan. 2019) at 6, https://perma.cc/VT5M-F5TP.

[104] *Flores v. Reno*, Stipulated Settlement Agreement Ex. 1 ¶ B, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997).

1666577

1

## CAUSES OF ACTION

2

## COUNT 1—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

3

*(All Plaintiffs)*

4
    214.    All prior allegations are incorporated as though set forth fully herein.

5
    215.    In Arizona, a plaintiff states a claim for intentional infliction of emotional distress

6
by alleging that the defendant caused severe emotional distress by committing extreme and

7
outrageous conduct with the intent to cause emotional distress or with reckless disregard of the

8
near-certainty that such distress would result.

9
    216.    The government intended to leverage the trauma of family separation as a

10
deterrent. Its conduct in separating families, with its attendant failures to provide children with

11
appropriate care and protection from abuse, track separated children, and tell their parents

12
anything about their children's whereabouts and well-being evinces, at worst, the government's

13
intent to increase their suffering to maximize the deterrent effect of the Family-Separation Policy

14
and, at best, its reckless disregard for the well-being of the families it separated.

15
    217.    The government's conduct was extreme and outrageous. The government

16
physically removed the sobbing Plaintiff children from the Plaintiff parents with no notice and no

17
plan to reunify them, refused for weeks to respond to the Plaintiff parents' questions about their

18
children, and sought to leverage the separation in an attempt to coerce the Plaintiff parents into

19
abandoning their claims for asylum and accepting deportation. The government separated the

20
Plaintiff families to deter future asylum applications and to encourage asylum seekers like the

21
Plaintiff families to abandon their asylum claims, even though the Plaintiff families had a right to

22
present those claims to the U.S. government under both federal and international law. Put bluntly,

23
the government intended the Family-Separation Policy to inflict trauma on vulnerable children

24
and their families—that was the point. And even if it didn't so intend, it knew or should have

25
known that its Policy would inflict such trauma, and it implemented the Policy and separated the

26
Plaintiff families anyway. In either case, that government's conduct was both extreme and

27
outrageous.

28
    218.    Additionally, the government acted with a reckless disregard of the near-certainty

1666577

of the distress that its Policy would cause. As the Pilot Program demonstrated, the government was on notice of the harms of family separation well before it apprehended Plaintiffs and forcibly separated them. Officials within DHS and DOJ were aware of the near-certainty that children and parents would suffer emotional distress as a result of separation, and they warned superior officials of this near-certain consequence. The government implemented the Family-Separation Policy and separated the Plaintiff families anyway.

219. The government's actions caused the Plaintiffs severe emotional distress. At the time of the families' separations, Plaintiffs suffered emotional trauma in a manner they had never previously experienced. Young children thought they would never see their parents again. A parent sobbed as she bathed her daughter at the order of government officials, fearing that she engaged in the last act of parenting she would ever be allowed to perform for her child. The parent and child Plaintiffs alike became physically ill because of the stress of their separations. And the consequences of the separations linger to this day, with parent-child bonds suffering from continuing harm, adults suffering from continuing anxiety, and children suffering severe developmental consequences.

## COUNT 2—NEGLIGENCE

### (All Plaintiffs)

220. All prior allegations are incorporated as though set forth fully herein.

221. In Arizona, negligence requires a showing of duty, breach, causation, and harm.

222. The federal agents referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause unnecessary harm or injury to Plaintiffs. While Plaintiffs were in federal custody, federal agents owed them a duty of protection and aid against unreasonable harm.

223. By engaging in the alleged acts herein, these federal agents failed to act with ordinary care and breached the duty of care owed to Plaintiffs. For example, federal agents should have explained to Plaintiffs in a language that Plaintiffs understood why they were being separated, but failed to do so. Federal agents should have tracked the fact that Plaintiffs were separated, but failed to do so. Federal agents should have provided Plaintiff parents with

information about their children—their location, their well-being, and information about any harms they suffered—but failed to do so. Federal agents also should have inspected Wilbur's feet and provided him with medical care, but failed to do so.

224.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damage.

## COUNT 3—ABUSE OF PROCESS

*(All Plaintiffs)*

225.    All prior allegations are incorporated as though set forth fully herein.

226.    In Arizona, the elements of an abuse-of-process claim are (1) a willful act in the use of a judicial process (2) for an ulterior purpose not proper in the regular conduct of the proceedings. Liability attaches where the process is used primarily to accomplish a purpose for which it was not designed and can flow from the entire range of procedures incident to litigation.

227.    In the case of Erendira, the government instituted a criminal prosecution, which is a willful act incident to a judicial process. The government's ulterior purpose for doing so was to forcibly separate Erendira and Yasmin in a manner that deterred them from seeking asylum in the United States and, further, that generated publicity. This is an impermissible purpose in the regular conduct of proceedings.

228.    In the case of all Plaintiffs, including Erendira, the government wielded its immigration detention authority, which is a willful act incident to a judicial process (removal proceedings and deportation) for the improper ulterior motive of forcibly separating families such as Plaintiffs in a manner that generated publicity, as well as for the improper ulterior motive of deterring Plaintiffs from asserting their rights, protected by both U.S. and international law, to seek asylum in the United States.

## COUNT 4—NEGLIGENT SUPERVISION/BREACH OF FIDUCIARY DUTY

*(All Plaintiffs)*

229.    All prior allegations are incorporated as though set forth fully herein.

230.    In Arizona, negligent supervision and breach of fiduciary duty are a species of negligence. A fiduciary duty exists where one party is bound to act for the benefit of others.

231.    The government, having decided to separate the Plaintiff children from the Plaintiff parents, assumed a fiduciary duty to care for the Plaintiff children.

232.    The government breached this duty to Wilfredo by failing to provide him with adequate supervision. This failure led to Wilfredo suffering a sexual assault and other injuries, as alleged above.

233.    Furthermore, once the government had notice that Wilfredo had suffered a sexual assault, it had an obligation to provide him with appropriate services, such as counseling and therapy. It failed to do so.

234.    The government breached this duty to Yasmin and Karl by failing to provide them with adequate Mam interpretation. The government, having seized these children from their parents' custody, had a duty to ascertain the children's native language. On information and belief, in the facilities where these children were detained, the government provided some services and communicated with children in Spanish but failed to provide Yasmin and Karl services or to communicate with them in Mam, further isolating them and exacerbating their feelings of emotional distress.

## COUNT 5—LOSS OF CONSORTIUM

### *(All Plaintiffs)*

235.    All prior allegations are incorporated as though set forth fully herein.

236.    In Arizona, a loss-of-consortium claim requires proof of an underlying tort along with a loss of society, companionship, care, support, and affection. Arizona law recognizes both the child and the parent's right to assert such a claim.

237.    All Plaintiffs suffered a loss of society, companionship, care, support, and affection as a result of Defendant's commission of the other torts alleged in this Complaint. For example, as a result of the government's intentional infliction of emotional distress and abuse of process, all Plaintiffs were separated from a close family member, either a parent or child, while detained in a foreign country. Under these circumstances, any person would seek familial companionship, care, support, and affection, yet Plaintiffs could not because the government confined each member of the Plaintiff families in different facilities from each other.

238.     The government's negligence, which prevented families from communicating and slowed their reunification, also deprived Plaintiffs of the ability to seek comfort in each other.

239.     By way of further example, in the aftermath of the sexual assault that Wilfredo suffered, he lacked the ability to talk to and seek comfort in his father, and the government's separation of that family and the government's failure to supervise are but-for causes of this independent deprivation suffered by Wilfredo.

240.     Even after reunification, the severe emotional trauma the Plaintiff children suffered has continued to impact their development and changed them profoundly, causing them to be withdrawn, fearful, and often crippled by anxiety. The effects of the separation continue to deprive the Plaintiff parents of the companionship of their children. Similarly, the Plaintiff children are deprived of the companionship of their parents where their parents' emotional distress has changed them profoundly.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully pray that this Court assume jurisdiction over this action and issue a judgment granting Plaintiffs:

A.     Compensatory damages;

B.     Punitive damages;

C.     Attorneys' fees and costs as allowable by law, including by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D.     Such other and further relief as the Court deems just.

//

//

COMPLAINT
Case No. 3:21-cv-4457

1666577

1

# **DEMAND FOR JURY TRIAL**

2  FTCA claims are tried to the bench. 28 U.S.C. § 2402. Plaintiffs demand a jury trial on

3  any claims that are, at the time of trial, triable by jury, whether because of a change of law or an

4  amendment to the pleadings.

5

6  Dated: June 10, 2021                               KEKER, VAN NEST & PETERS LLP

7

8                                      By:   /s/ Travis Silva
                                             BROOK DOOLEY
9                                            TRAVIS SILVA
                                             CHRISTOPHER S. SUN
10

11

12  Dated: June 10, 2021                               LAWYERS' COMMITTEE FOR CIVIL
                                                       RIGHTS OF THE SAN FRANCISCO
13                                                     BAY AREA

14

15                                     By:   /s/ Hayden Rodarte
                                             BREE BERNWANGER*
16                                           HAYDEN RODARTE
                                             * N.D. Cal. admission pending
17

18                                           Attorneys for Plaintiffs WILBUR P. G.;
                                             WILFREDO BALTAZAR P. E., a minor
19                                           child; ERENDIRA C. M.; YASMIN
                                             ALICIA M. C., a minor child; JOSHUA G.
20                                           G.; and KARL LUIS G. G., minor child

21

22

23

24

25

26

27

28  *The filing attorney attests within the meaning of Civil Local Rule 5-1(i)(3) that all signatories to this filing concur in the filing of this document.*

COMPLAINT
Case No. 3:21-cv-4457

1666577